**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

In the Matter of:

CIVIL INVESTIGATIVE DEMAND TO
DR. HOAU-YAN WANG,                          Misc. Action No.

dated June 22, 2026.

**DR. HOAU-YAN WANG'S MOTION TO SET ASIDE**
**CIVIL INVESTIGATIVE DEMAND PURSUANT TO 31 U.S.C. § 3733(j)(2)**

Dr. Hoau-Yan Wang ("Dr. Wang") moves this Court to set aside a civil investigative demand ("CID"), attached hereto as Exhibit A, ordering him to testify on July 2, 2026, in Philadelphia, Pennsylvania, where he resides. Dr. Wang has been subjected to five years of nearly constant investigation and harassment by numerous federal agencies without a single finding of misconduct against him. Most recently, in October 2025, following jury selection but prior to opening statements, the Government dismissed with prejudice a federal criminal case in the District of Maryland containing the same basic allegations as those under investigation in the CID. The Government dismissed that case after findings of *Brady* and *Batson* violations and multiple Government misrepresentations on the record. The Court apologized to Dr. Wang for the Government's protracted impact on his life and made clear to the Government that it did not want to see claims against Dr. Wang back in court again. For its part, the Government asked Dr. Wang to agree not to sue it under the Hyde Act, never mentioning to the Court or Dr. Wang that another DOJ component was waiting in the wings to investigate him. What's more, three other federal agencies and Dr. Wang's employer previously concluded investigations into the same matters under investigation in the CID without making any findings of misconduct. In fact, Dr. Wang's employer – acting on behalf of one of those federal government agencies – affirmatively

concluded, by a preponderance of the evidence, that Dr. Wang **had not** engaged in research misconduct.

This is the Government's fifth bite at the apple in a case involving a 69-year-old retired professor with an entirely clean record outside this protracted investigation and with assets that have been substantially depleted by years of battling the Government on many fronts. The Government should have chosen long ago to stop harassing Dr. Wang, but since it has refused to exercise that discretion, we now ask this Court to quash the offending CID, pursuant to 31 U.S.C. § 3733(j)(2), for three independent reasons. First, the CID imposes an undue and duplicative burden on Dr. Wang by seeking information that has already been the subject of years of investigation, much of which has been shared throughout the Government. Second, it seeks information of minimal incremental investigative value, particularly where the same underlying allegations were previously reviewed through a specialized government research-misconduct framework established by Congress, culminating in findings that research misconduct did not occur. Finally, it constitutes an unreasonable, oppressive, and harassing use of compulsory process under the circumstances.

## I.   BACKGROUND

### A.   Dr. Wang's Alzheimer's Research for Cassava

Dr. Wang is a neuroscientist who recently retired from a position as a tenured medical professor at the City University of New York ("CUNY"), where he conducted biomedical and neuroscience research, including research relating to Alzheimer's disease. *See* Ex. B, Indictment ¶¶ 1-2, *United States v. Hoau-Yan Wang*, No. 8:24-cr-00211-TDC (D. Md. June 27, 2024). Dr. Wang was an advisor and consultant to, and conducted drug research for, Cassava Sciences, Inc. ("Cassava"), a publicly traded biopharmaceutical company, from 2005 to 2023. *Id*. at ¶ 3. Cassava focused on research and development of an Alzheimer's drug called simufilam and funded certain

of its work through NIH grants. *Id.* at ¶¶ 2, 10. As part of his research for Cassava, Dr. Wang used a methodology called western blotting to detect and analyze proteins in biological samples. *Id*. at ¶ 9.

### B.    The FDA Review – The First Bite at the Apple

From 2005 to August 2021, Dr. Wang's work was repeatedly published in peer-reviewed scientific journals and generally accepted by the NIH. *See generally id*. Then, in August 2021, a group of short-sellers of Cassava stock, who later publicly admitted that they stood to and did gain financially from a decline in Cassava's stock price, submitted a Citizen Petition to the FDA seeking suspension of ongoing clinical trials involving simufilam by claiming, among other things, that Dr. Wang's western blotting images had been fabricated. Ex. C, Citizen Petition to the FDA from Jordan A. Thomas, Labaton Sucharow LLP (Aug. 18, 2021); Ex. D, Cassava Sciences, Inc., Press Release, FDA Denies Citizen Petitions Filed on Behalf of Short Selling Clients ("Cassava Press Release") (Feb. 10, 2022). In February 2022, the FDA denied the Citizen Petition and permitted the simufilam trials to continue. *See* Ex. D (reporting that FDA denied the August 2021 Citizen Petition and related supplements).

In April 2022, the FDA requested that CUNY participate in a voluntary remote record review concerning studies submitted to the FDA in support of simufilam. Ex. E, FDA Letter, dated Apr. 7, 2022. CUNY agreed, and from September 14 through September 16, 2022, the FDA conducted a thorough inspection of Dr. Wang's laboratory at CUNY and interviewed Dr. Wang and his laboratory staff. Ex. F, FDA Establishment Inspection Report ("EIR"), at 1-2. The comprehensive inspection reviewed, among other things, sample receiving and storage records, equipment operation and calibration records, study sample analysis, methodology, standard operating procedures, temperature-monitoring logs, and analytical results. *Id.* at 1-2. While the FDA issued a Form 483 identifying eight observations relating to procedural issues like assay

validation, documentation, recordkeeping, equipment calibration, and data controls (*id.* at 2-3), it did <u>not</u> conclude that Dr. Wang engaged in scientific fraud, fabrication, falsification, or research misconduct. *See generally id.*

### C.   HHS-ORI and CUNY Research-Misconduct Review – The Second Bite at the Apple

In general, allegations of fabrication, falsification, or plagiarism relating to NIH-funded research are governed by a specialized administrative and institutional review framework involving both the relevant research institution (here, CUNY) and the United States Department of Health and Human Services ("HHS") Office of Research Integrity ("ORI"). *Anversa v. Partners Healthcare Sys.*, 835 F.3d 167, 170 (1st Cir. 2016) (citing 42 U.S.C. § 289b(a)(1)). Institutions receiving NIH funding are responsible for conducting thorough inquiries and investigations into allegations of research misconduct involving that funding. *Id.* (assigning recipient institutions primary responsibility for conducting inquiries and investigations into allegations of research misconduct arising from federally funded research). Such investigations must be comprehensive and well-documented and must include examination of all relevant research records and evidence, interviews of relevant witnesses, and diligent pursuit of all significant issues and leads relevant to the allegations. *Id.* After the institution's work concludes, HHS/ORI reviews those investigative findings and supporting materials, chooses whether to request additional information or clarification from the institution, and determines whether further administrative actions or findings are warranted. *Id.*

Following that framework, in May 2025, CUNY's research misconduct investigation committee concluded, based on its review of the documentary record and an interview of Dr. Wang, that "Dr. Wang had **not engaged in research misconduct** as defined by CUNY policy" and had not engaged in "intentional, knowing, or reckless falsification and/or fabrication." *See* Ex.

4

G, Defendant's Memorandum in Support of Motion to Dismiss for Prosecutorial Misconduct, *United States v. Wang*, No. TDC-24-211 (D. Md. Oct. 14, 2025), ECF No. 118-1, including CUNY-ORI Letter at 2, attached as Ex. 1 thereto, ECF No. 118-2 ("CUNY-ORI Letter")) (emphasis added). CUNY then informed ORI that the University had "accepted the Committee's findings and determined that **research misconduct did not occur**." *Id.* at 2, 17 (emphasis added). Subsequent to its receipt of CUNY's findings, ORI has apparently taken no further adverse actions against Dr. Wang.

**D.      The SEC Settlement Without Admission or Denial – The Third Bite at the Apple**

Separately, the Securities and Exchange Commission ("SEC") initiated an investigation concerning Cassava's public disclosures about its simufilam research, some of which involved Dr. Wang's western blotting images. The staging of the SEC's investigation relative to the then-pending criminal case surrounding his western blotting work forced Dr. Wang to assert his Fifth Amendment right not to incriminate himself and allowed the SEC to leverage a settlement based on the attendant adverse inference from Dr. Wang's invocation of his constitutional rights. On September 26, 2024, the SEC and Dr. Wang entered into a settlement agreement in which Dr. Wang neither admitted nor denied the Commission's findings and agreed to pay the SEC $50,000 (a nominal amount in comparison to the claimed multi-million grant fraud the Government has claimed to be investigating). Ex. H, SEC Order Instituting Cease-and-Desist Proceedings, dated Sept. 26, 2024.

**E.      The DOJ Fraud Section Voluntary Dismissal  – The Fourth Bite at the Apple**

On June 27, 2024, a grand jury returned an indictment charging Dr. Wang with major fraud against the United States, wire fraud, and false statements arising from allegations concerning his western blotting work for Cassava and Cassava's decision to secure NIH funding based on that

work. Ex. A at ¶¶ 10-15. Like the investigations that preceded it, the Government's case was based almost entirely on Dr. Wang's western blot images and expert testimony supposedly interpreting those images and determining they had been manipulated. *See generally id.* After years of investigation, the Government did not develop a single fact witness against Dr. Wang from Cassava, CUNY or otherwise or find a single document suggesting Dr. Wang had engaged in misconduct. And, things only went downhill for the Government from there. First, the Court drastically narrowed the scope of permissible expert testimony on scientific image analysis and western blot interpretation, finding that the methodology employed by the Government's sole expert witness's "purported expertise in forensic image analysis" was unreliable. Ex. O, Order, *United States v. Wang*, No. TDC-24-211 (D. Md. Oct. 14, 2025), at 2 ¶ 3.c. Then, just weeks before trial in October 2025, the Government revealed that it had failed to share in discovery that nearly six months earlier CUNY had decided, and ORI had apparently agreed, that "Dr. Wang had **not engaged in research misconduct** as defined by CUNY policy" and had not engaged in "intentional, knowing, or reckless falsification and/or fabrication." *See* Ex. G at 2.

Defense counsel thereafter advised the Government that its failure to disclose the CUNY/ORI materials constituted a significant *Brady* violation. *See* Ex. G at 3-4. Rather than conceding its critical error, the Government claimed that the report was not *Brady*. As the argument went, the Government did not have to produce ORI's files because ORI had never been part of the prosecution team, and the CUNY/ORI report had no evidentiary value because CUNY and ORI did not have access to supposedly key western blotting images uncovered by the Government. Then, on October 22, 2025—days before trial—the Government conceded that its prior representations concerning the materials it had provided to ORI were false and that the Government had, in fact, provided ORI with the supposedly key western blot images that it claimed

undercut the value of CUNY's findings. Ex. I, Letter from Trial Attorney Andrew Tyler to Hon. Theodore D. Chuang (Oct. 22, 2025). The Court found a *Brady* violation, granted a brief continuance, and ordered the Government to produce certain ORI files. Ex. O at 2 ¶ 4. For the misconduct trifecta, the court also upheld during jury selection a *Batson* challenge after the Government impermissibly struck the only Asian-American juror in the venire without cause.

The Government moved to dismiss the indictment with prejudice, and the court granted the motion. *See* Ex. J, Government's Unopposed Motion to Dismiss Indictment with Prejudice, *United States v. Wang*, No. TDC-24-211 (D. Md. Oct. 22, 2025), ECF No. 139; Ex. K, Order Granting Motion to Dismiss Indictment, *United States v. Wang*, No. TDC-24-211 (D. Md. Oct. 23, 2025), ECF No. 143. In the hearing on the motion, Judge Theodore D. Chuang questioned the timing and circumstances surrounding the Government's request to dismiss the prosecution after many years of investigation, extensive pretrial litigation, expert proceedings, and jury selection. Ex. L, Transcript of Motion Hearing ("10/23/25 Mot. Hr'g Tr.") at 3-5, *United States v. Wang*, No. 8:24-cr-00211-TDC (D. Md. Oct. 23, 2025). Judge Chuang then granted the motion and said he found the "whole episode" "disappointing in a lot of different ways." *Id.* at 16:4-6. The Judge also confirmed that "given how broad the allegations in the indictment were about all these different [western blot] images and different [NIH] grants that weren't necessarily the subject of a specific count," there can be no "re-prosecution . . . on other alleged false statements or fraudulent submissions." *Id.* at 15:3-16:3.

The Judge further emphasized the substantial burden imposed on Dr. Wang personally, observing that Dr. Wang had been required to expend significant "time, energy, and expense" defending the case and noting "it's not as if there's no consequences" to Dr. Wang "for having gone through all this." *Id.* at 16:12-20. The court further stated that "Dr. Wang was put through

7

this whole process up to this point," which is "very regrettable" and "doesn't speak well of our justice system." *Id.* at 17:3-5, 10-12. Judge Chuang commended Dr. Wang "for pushing this far and holding the government to its proof," but noted he does not "think there's any winners from the defense side in the sense of what happened here." *Id.* at 17:6-13. Judge Chuang further noted that there were things the court wished "the Justice Department had done" and that he hopes "they will think about how to do [] better in the future." *Id.* at 18:3-9. Judge Chaung then wished Dr. Wang well and said he hoped that the case would not change Dr. Wang's "view of how our justice system can and should work when it's working at its best." *Id.* at 19:12-15. The implication was certainly not that Dr. Wang would find himself back in another federal court addressing the same allegations within a matter of months.

### F.    The Present Case – The Fifth Bite at the Apple

In March and July 2022, the U.S. Attorney's Office for the Southern District of New York issued two False Claims Act CIDs to Dr. Wang, again concerning his western blotting work for Cassava. Ex. M, CID No. 22-053 (Mar. 22, 2022); Ex. N, CID No. 22-069 (July 14, 2022). The CIDs sought extensive documentary materials and information concerning Dr. Wang's western blotting work for Cassava, in response to which Dr. Wang produced voluminous records. Dr. Wang is also aware that CUNY made a significant production of records in response to its own CID(s). After nearly four years of silence in the matter, Dr. Wang received the CID that is the subject of this motion on June 22, 2026. Ex. A. The CID requests his testimony on July 2, 2026, again on the topic of his western blotting work for Cassava. *Id.*

### G.    This Motion's Timing and Venue

Under 31 U.S.C. § 3733(j)(2), a CID recipient may petition to modify or set aside a CID "[a]t any time before the return date specified in the demand, or within 20 days after the demand

has been served, whichever period is shorter." *Id.* Here, the return date specified in the CID precedes the expiration of the twenty-day period following service, and this motion is being filed before that return date.[1] As to venue, 31 U.S.C. § 3733(j)(2) also provides that a petition to modify or set aside a CID may be filed in the district court of the United States for any judicial district in which the recipient resides, is found, or transacts business. *Id*. Dr. Wang resides in the Eastern District of Pennsylvania, which is also the proposed venue for the deposition under the CID. Ex. B ¶ 1. Accordingly, venue and jurisdiction are proper in this Court under 31 U.S.C. § 3733(j)(2).

## II.     LEGAL STANDARD

The False Claims Act ("FCA"), 31 U.S.C. §§ 3729 et seq., authorizes the Government to investigate and pursue claims involving alleged fraud against the United States. To facilitate such investigations, the Attorney General may issue CIDs prior to commencing a civil proceeding under the FCA if the Government believes that "any person may be in possession, custody, or control of any documentary material or information relevant to a false claims law investigation." *See id.* § 3733(a)(1); *United States v. Witmer*, 835 F. Supp. 208, 219 (M.D. Pa. 1993).

A CID recipient may move to modify or set aside a CID where it has been issued for an improper purpose, including where the CID's enforcement would violate a constitutional or other legal right or privilege. *Id.* § 3733(j)(2); *see Witmer*, 835 F. Supp. at 219 (addressing challenge to CIDs based on allegations that they were issued as "ex parte discovery tools" and to place respondents' Fifth Amendment invocations on the record). Courts reviewing motions to set aside or modify CIDs routinely apply the same principles governing judicial and administrative subpoenas. *See Consumer Fin. Prot. Bureau v. Heartland Campus Sols., ECSI,* 747 F. App'x 44,

---

[1] The Government served a previous CID that is now moot because counsel negotiated a new compliance date.

48-49 (3d Cir. 2018) (applying traditional administrative-subpoena principles in reviewing and enforcing a CID); *see also* 31 U.S.C. § 3733(b)(1). These principles include whether the demand is unreasonable, oppressive, unduly burdensome, or issued for an improper purpose. *See Avago Techs. U.S., Inc. v. IPtronics Inc.*, 309 F.R.D. 294, 296-97 (E.D. Pa. 2015) (recognizing that discovery may be denied where compliance would be unduly burdensome and that courts must balance the requesting party's need against the burden and hardship imposed on the subpoena recipient); *Composition Roofers Union Local 30 Welfare Trust Fund v. Graveley Roofing Enters., Inc.*, 160 F.R.D. 70, 72 (E.D. Pa. 1995) (explaining that a subpoena may be quashed where compliance would be "unreasonable and oppressive"); *In re Novo Nordisk Sec. Litig.*, 530 F. Supp. 3d 495, 501 (D.N.J. 2021) (explaining that, in evaluating the reasonableness of a subpoena, courts consider "the need of the party for the documents," among other factors); *Wheeling-Pittsburgh Steel Corp.*, 648 F.2d at 124-25 (recognizing that courts may refuse to enforce an administrative subpoena where enforcement would constitute an abuse of the judicial process and emphasizing that "a court may not permit its process to be abused"); *id.* at 128 (explaining that an abuse occurs where compulsory process is employed "for an improper purpose, such as to harass [a party] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation"). Whether a CID is unreasonable, oppressive, unduly burdensome or issued for an improper purpose depends upon the particular circumstances presented. *See* 5A Moore's Federal Practice ¶ 40.05[2].

III.    **ARGUMENT**

A.    **The CID Imposes an Undue and Duplicative Burden on Dr. Wang.**

Courts evaluating whether a CID imposes an undue burden consider, among other factors, the requesting party's need for the information, the breadth of the requests, the time period covered, the particularity of the requests, and the burden imposed by compliance. *In re Domestic Drywall*

*Antitrust Litig.*, 300 F.R.D. 234, 252 (E.D. Pa. 2014); *Gabe Staino Motors v. Volkswagen of Am.*, 2003 U.S. Dist. LEXIS 3194, *5 (E.D. Pa. Feb. 27, 2003). Discovery should also be limited where it is "unreasonably cumulative or duplicative" or where the requesting party has already had ample opportunity to obtain the information. Fed. R. Civ. P. 26(b)(2)(C); *see FDIC v. Wentz*, 55 F.3d 905, 908 (3d Cir. 1995) ("To obtain enforcement of an administrative subpoena, the agency must show that . . . the information demanded is not already within the agency's possession."); *Henry v. Pa. Dep't of Corr.*, 2026 U.S. Dist. LEXIS 3766, *11 (M.D. Pa. 2026) ("[T]he court may limit discovery if . . . the party seeking discovery has had ample opportunity to obtain the information through discovery").

Here, the CID seeks testimony concerning substantially the same alleged misconduct theories that have been the subject of nearly five years of overlapping investigations by DOJ, the SEC, the FDA, HHS/ORI, CUNY, and now SDNY. *See* Ex. A. Many of these investigations proceeded in unison, with the participating agencies sharing information, evidence, and investigative findings concerning substantially the same underlying allegations, as evidenced by the fact that the Government produced in discovery in the criminal matter files from each of the agencies listed above, including SDNY. The overlap between the five investigations is extensive. All of them center around Dr. Wang's western blotting work and request all of his images and data regarding that work; his communications with Cassava, scientific journals, the NIH and others about those findings; and his compensation from Cassava. The present CID seeks substantially the same information concerning the same underlying allegations and subject matter about which Dr. Wang has been investigated for five years – "Western blots, conducted by [Dr. Wang] or at [his] lab at [CUNY] that was included or referenced in any of Cassava's grant applications to NIH." Ex. A at 2.

11

The Government has had years of access to extensive documentary materials, testimony, expert analyses, institutional findings, and investigative mechanisms concerning the precise issues raised by the CID, including Dr. Wang's responses to two former CIDs in this matter. *Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191-92 (3d Cir. 1999) (affirming denial of discovery as unreasonably cumulative where the requesting party had "already discovered the gold" and the district court concluded that the aims of discovery had been satisfied) (internal quotation marks omitted); *Avago Techs.*, 309 F.R.D. at 297 ("The court must limit the . . . extent of discovery . . . where the party seeking discovery has had *ample opportunity to obtain the discovery*.") (emphasis added and internal quotation marks omitted). For years, multiple federal agencies and investigative bodies have examined the same underlying allegations concerning Dr. Wang's research, publications, western blot images, grant submissions, and related scientific materials. In connection with those investigations, the Government obtained extensive document productions, witness testimony, expert analyses, institutional findings, and other information bearing directly on the issues identified in the present CID. Having had ample opportunity to obtain and evaluate this information, the Government cannot now demonstrate a meaningful need for yet another demand seeking substantially the same information. To the contrary, the CID is cumulative of information already obtained, reviewed, and analyzed through prior investigations and proceedings and therefore constitutes an unreasonable and unnecessary use of compulsory process. *See United States v. Powell*, 379 U.S. 48, 57-58 (1964) (requiring that an agency investigation be conducted for a legitimate purpose, that the inquiry be relevant, that the information sought *not already be within the agency's possession*). Under these circumstances, the CID should be set aside.

12

**B.**    **The CID Seeks Information of Minimal Incremental Investigative Value**

The scope of permissible compulsory process is further limited by principles of relevance and proportionality. Although Rule 45 does not expressly identify irrelevance as a basis to quash a subpoena, courts consistently recognize that "the scope of discovery allowed under Rule 45 is limited by the relevancy requirement" of Rule 26. *Lehigh Valley 1 LLC v. Whitehall Fiduciary LLC*, 2025 U.S. Dist. LEXIS 252124, at *4 (E.D. Pa. Dec. 5, 2025) (stating that discovery is allowed to the extent it is "relevant to [a] party's claim or defense"). Accordingly, subpoenas seeking information of questionable relevance or minimal practical utility should be quashed to avoid imposing undue burden. *See United States v. Morris (In re Zimmer)*, 619 B.R. 591, 594 (Bankr. W.D. Pa. 2020) (recognizing that a subpoena may be quashed where "no further evidence could affect a conclusion made by the court").

The scientific research and alleged misconduct theories underlying the present CID have been subjected to years of review and investigation by numerous governmental, regulatory, criminal, civil, and institutional bodies and the expert witnesses hired by those agencies. Most significantly, CUNY—through the research-misconduct review process overseen by HHS/ORI—conducted the precise type of scientific and institutional review contemplated by the applicable regulatory framework and concluded that there was **insufficient evidence** to support findings that Dr. Wang committed research misconduct, including with respect to allegations concerning falsification or fabrication of the western blotting work that is the subject of this CID. *See* Ex. G at 2. HHS/ORI and CUNY possess the specialized scientific expertise and institutional mechanisms specifically designed to evaluate allegations concerning scientific data integrity, laboratory practices, image analyses, publication issues, and research misconduct. *See* 42 U.S.C. § 289b; 42 C.F.R. pt. 93. Indeed, Congress and HHS established a specialized research-misconduct framework precisely because allegations involving scientific research often require expert

13

scientific evaluation beyond the ordinary competence of law-enforcement personnel and courts. *Id.*; *Anversa v. Partners Healthcare Sys.*, 835 F.3d 167, 170 (1st Cir. 2016) ("Congress created the Office of Research Integrity (ORI) . . . and tasked ORI with responsibility for carrying out regulations to be promulgated by the Secretary of HHS (the Secretary) for the investigation of research misconduct allegations.").

The significance of the CUNY and HHS/ORI findings is reinforced by the evidentiary standard governing research-misconduct proceedings. Under HHS regulations, research misconduct must be established by a preponderance of the evidence. *See Anversa*, 835 F.3d at 170 ("Establishing research misconduct requires a showing, by a preponderance of the evidence, of 'a significant departure from accepted practices of the relevant research community' that is 'committed intentionally, knowingly, or recklessly.'" (quoting  42 C.F.R. § 93.103)). That burden mirrors the standard generally applicable in civil FCA proceedings. *See United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 748 (2023) (noting that FCA liability must be proven by a preponderance of the evidence). The Government has offered no explanation for disregarding the findings of the very agency charged with making this specialized scientific review, nor has it identified any basis to believe that renewed compulsory process is likely to produce a materially different conclusion when applying the same burden of proof. *See Wheeling-Pittsburgh Steel Corp.*, 648 F.2d at 127 (emphasizing that courts need not enforce compulsory process where the agency is pursuing allegations it has *no reasonable expectation of proving*); *cf. United States v. Markwood*, 48 F.3d 969, 978 (6th Cir. 1995) (recognizing that agency process may be resisted where the Government acts in bad faith, which "connotes a conscious decision by an agency to pursue a groundless allegation *without hope of proving that allegation*") (quoting *Wheeling-Pittsburgh Steel Corp.*, 648 F.2d at 125 (emphasis added)).

14

Why the Government believes that its work now should substitute for or supplement that Congressionally established process is unclear. This is especially true where a grand jury investigation failed to reveal admissible evidence undercutting the conclusions of CUNY and HHS/ORI. There is simply no suggestion that the CID is likely to yield information of meaningful incremental value. The Government identifies no newly discovered evidence, intervening scientific development, materially changed circumstance, or new misconduct theory that would differentiate this CID from the previous investigative attempts. The motion to set aside the CID should be granted.

### C.    The CID is an Oppressive and Harassing Use of Compulsory Process

While the Government possesses broad investigative authority, that authority is not without limits. Courts have long recognized that compulsory process may be set aside where it is used for an improper purpose, including harassment. *Wheeling-Pittsburgh Steel Corp.*, 648 F.2d at 128 (recognizing that enforcement may be denied where investigative process is used for an improper purpose, including to harass a target or exert pressure unrelated to the legitimate objectives of the investigation); *Bd. of Governors*, 2026 U.S. Dist. LEXIS 52927, at *15-16 (recognizing that prosecutors may not use compulsory process to conduct "arbitrary fishing expeditions" or target individuals out of an "intent to harass").

The concern here is not any single subpoena, CID, or agency investigation viewed in isolation. Rather, it is the cumulative effect of five years of overlapping governmental investigations and compulsory process directed at Dr. Wang concerning substantially the same scientific research, publications, NIH grant applications, western blot analyses, and alleged misconduct theories, coupled with a criminal prosecution tainted by multiple instances of Government misconduct and ultimately dismissed with prejudice. The significance of that history is not merely that the prosecution ended. Rather, despite years of effort, the Government failed to

15

obtain a support a single finding of misconduct against Dr. Wang. The Government's endless quest must stop.

Judge Chuang expressly recognized the substantial burden the Government's actions ]imposed on Dr. Wang and described the circumstances as "regrettable and unfortunate" and "not a good example of how things should be done." Ex. L at 3, 5, 16, 17, 21. Yet rather than heeding those concerns and bringing finality to a matter that had already consumed years of Dr. Wang's life and resources, the Government now seeks to compel Dr. Wang once again to provide testimony concerning substantially the same allegations and subject matter. The present CID perpetuates the very burden and repetition that concerned Judge Chuang in the criminal proceedings.

At some point, repeated resort to compulsory process, without any meaningful new factual predicate or theory, ceases to reflect a legitimate investigative need and instead becomes harassment by accumulation. If the Government's real goal here is to take advantage of the adverse inference by forcing Dr. Wang to again assert his Fifth Amendment rights – which he may well do because of his growing disbelief in the Government's commitments not to further pursue him criminally – that is itself an inappropriate attempt to leverage Dr. Wang's constitutional rights against him and further grounds to quash the subpoena.

Dr. Wang and his family walked out of court in the District of Maryland believing they had finally put this dark episode of their lives behind them. When they received this CID, the wounds of the same Government overreach and baseless expert theories came rushing back. Dr. Wang should not be required to relitigate the same allegations – which all originated from financially-motivated short sellers of Cassava stock – through yet another compulsory process alternative. Dr. Wang and undersigned counsel – who has represented Dr. Wang since he first learned that the Government was investigating him – implore the Court to set aside the CID as an unreasonable

and oppressive use of investigative authority under the circumstances and permit Dr. Wang and his family to move on with their lives.

## III.    CONCLUSION

For the foregoing reasons, Dr. Wang respectfully requests that the Court set aside the Civil Investigative Demand pursuant to 31 U.S.C. § 3733(j)(2). Dr. Wang further requests such other and further relief as the Court deems just and proper.

Dated: July 1, 2026

Respectfully Submitted,

*/s/ Jennifer L. Beidel*
Jennifer L. Beidel
DYKEMA GOSSETT PLLC
39577 Woodward Avenue Suite 300
Bloomfield Hills, MI 48304
(248) 203-0700
jbeidel@dykema.com

***COUNSEL FOR DR. HOAU-YAN WANG***

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of July, 2026, I filed the foregoing Motion to Set Aside or Modify using the Court's CM/ECF system and served upon counsel via email to the following attorneys:

Lawrence Fogelman - Lawrence.Fogelman@usdoj.gov

Dominika Tarczynska - Dominika.Tarczynska@usdoj.gov.

*/s/ Jennifer L. Beidel*

Jennifer L. Beidel