UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

IN RE:

CIVIL INVESTIGATIVE DEMAND FOR DR. HOAU-YAN WANG

Movant.

**2:26-mc-00062-MMB**

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DR. WANG'S MOTION TO SET ASIDE CIVIL INVESTIGATIVE DEMAND AND IN SUPPORT OF THE GOVERNMENT'S CROSS-PETITION TO COMPEL COMPLIANCE**

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street
New York, New York 10007

DAVID METCALF
United States Attorney for the
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

Lawrence Fogelman
Dominika Tarczynska
Assistant United States Attorneys for the Southern District of New York
Special Assistant United States Attorneys for the Eastern District of Pennsylvania

Peter Carr
Assistant United States Attorney for the Eastern District of Pennsylvania
*Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................1

BACKGROUND ....................3

A. The Government's Civil Fraud Investigation ....................3

B. The Government's CID Seeking Testimony from Dr. Wang Is Not Duplicative of Any Other Investigation, Nor Has Any Other Agency Investigation Concluded That Dr. Wang Did Not Falsify Test Results ....................11

1) The FDA Did Not Clear Dr. Wang of Wrongdoing and Instead Identified a Concerning Lack of Documentation ....................12

2) Neither CUNY Nor ORI Determined That Dr. Wang's Testing Results Were Not Falsified ....................13

3) Far from Clearing Dr. Wang of Wrongdoing, the SEC Took Action Against Dr. Wang and Cassava for Manipulating Scientific Data ....................18

4) The Dismissal of DOJ Criminal's Case Does Not Detract from the Government's Need to Take Dr. Wang's Testimony ....................21

C. Dr. Wang Expressly Agreed To Provide CID Testimony on July 2 and Filed the Motion the Evening Before His Testimony ....................23

LEGAL STANDARDS ....................25

ARGUMENT ....................28

I. The Government's Investigation is Conducted for a Legitimate Purpose ....................28

II. The Testimony Sought Is Relevant to the Matters Under Investigation and Is Not Already in the Government's Possession ....................30

III. The Government Has Complied with the Administrative Steps Required by Statute ......31

IV. Dr. Wang Has Not Shown That It Is Unreasonable or Unduly Burdensome to Require Him to Provide Testimony ....................33

V. Dr. Wang's Assertion That the CID Is "Harassing" Is Without Merit ....................37

VI. The Court Should Compel Dr. Wang To Appear and Provide Testimony ....................38

CONCLUSION ....................39

## TABLE OF AUTHORITIES

Page(s)

Cases

*Alvarez v. Tropicana Hotel & Casino*,
No. 15-2061 (NLH), 2015 WL 9216584 (D.N.J. Dec. 17, 2015) ........ 22

*Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colleges & Schs.*,
183 F. Supp. 3d 79 (D.D.C. 2016) ........ 30

*F.D.I.C. v. Wentz*,
55 F.3d 905 (3d Cir. 1995) ........ 27

*FTC v. Texaco*,
555 F.2d 862 (D.C. Cir. 1977) ........ 26

*Gilarno v. Borough of Freedom*,
462 F. App'x 177 (3d Cir. 2012) ........ 22

*Helvering v. Mitchell*,
303 U.S. 391 (1938) ........ 23

*In re McVane*,
44 F.3d 1127 (2d Cir. 1995) ........ 30

*In re Morganroth*,
718 F.2d 161 (6th Cir. 1983) ........ 38

*McKnight v. Sch. Dist. of Philadelphia*,
105 F. Supp. 2d 438 (E.D. Pa. 2000) ........ 22

*Mitchell v. United States*,
526 U.S. 314 (1999) ........ 38

*Natures Image, Inc. v. U.S. Dep't of Lab.*,
No. 8:19-mc-00014-DOC-KESx, 2019 WL 4316514 (C.D. Cal. June 19, 2019) ........ 34

*N.L.R.B. v. Am. Med. Response, Inc.*,
438 F.3d 188 (2d Cir. 2006) ........ 30

*Nat'l Lab. Rels. Bd. v. Jo-Dan Madalisse Ltd, LLC*,
No. 15-MC-00228, 2015 WL 9302922 (E.D. Pa. Dec. 22, 2015) ........ 30

*Nosik v. Singe*,
40 F.3d 592 (2d Cir. 1994) ........ 22

*S.E.C. v. Saad*,
384 F. Supp. 2d 692 (S.D.N.Y. 2005) ........ 37

*SEC v. Dresser Indus., Inc.*,
628 F.2d 1368 (D.C. Cir. 1980) .......... 21, 26, 37

*SEC v. Graystone Nash, Inc.*,
25 F.3d 187 (3d Cir. 1994) .......... 38

*United States v. AGS Solutions Corp.*,
No.: 17 Civ. 1224 L (BGS), 2018 WL 1418023 (S.D. Cal. Mar. 22, 2018) .......... 26

*United States v. Anthem, Inc.*,
No. 18 MC 379 (GBD) (KNF), 2018 WL 11613957 (S.D.N.Y. Nov. 13, 2018) .......... 26, 27, 30

*United States v. Cross Senior Care, Inc., LLC*,
No. 8:19-MC-8-T-33TGW, 2019 WL 11502849 (M.D. Fla. Nov. 6, 2019) .......... 34

*United States v. Ianniello*,
646 F. Supp. 1289 (S.D.N.Y. 1986) .......... 23

*United States v. Jefferson*,
Civ. No. 25-1931 (ESK/SAK), 2025 WL 1583041 (D.N.J. May 20, 2025) .......... 26, 27

*United States v. Joint Active Sys., Inc.*,
No. CV 19-MC-91053-ADB, 2020 WL 9747630 (D. Mass. May 20, 2020) .......... 33

*United States v. Markwood*,
48 F.3d 969 (6th Cir. 1995) .......... 26

*United States v. Neifert-White, Co.*,
390 U.S. 228 (1968) .......... 28

*United States v. One Assortment of 89 Firearms*,
465 U.S. 354 (1984) .......... 23

*United States v. O'neill*,
619 F.2d 222 (3d Cir. 1980) .......... 30

*United States v. Powell*,
379 U.S. 48 (1964) .......... 27

*United States v. Witmer*,
835 F. Supp. 208 (M.D. Pa. 1993) .......... *passim*

*Univ. of Med. & Dentistry of New Jersey v. Corrigan*,
347 F.3d 57 (3d Cir. 2003) .......... 26, 27

Statutes and Regulations

18 U.S.C. § 1001 ........ 21

18 U.S.C. § 1031(a) ........ 21

18 U.S.C. § 1343 ........ 21

31 U.S.C. § 3729 ........ 1

31 U.S.C. § 3733 ........ 31

31 U.S.C. § 3733(a)(1) ........ 25, 31

31 U.S.C. § 3733(a)(2)(D) ........ 32

31 U.S.C. § 3733(j)(1) ........ 25, 26, 38

42 C.F.R. § 93.401 ........ 17, 35

## PRELIMINARY STATEMENT

The United States of America (the "Government" or "Respondent"), through the U.S. Attorney's Office for the Southern District of New York, is conducting a civil fraud investigation pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*. The Government's investigation concerns whether Cassava Sciences, Inc. (and or its officers, employees or affiliates, including Dr. Lindsay Burns) ("Cassava") and/or Dr. Hoau-Yan Wang, submitted or caused to be submitted false claims, false records, or false statements in connection with grants received from the National Institutes of Health ("NIH") relating to certain products to treat or detect Alzheimer's disease (the "Civil Fraud Investigation"). Specifically, Cassava and Dr. Wang collaborated on a drug called Simufilam, or PTI-125, that they claimed showed indicia of treating Alzheimer's disease. They also collaborated on a blood test called SavaDX that they claimed could detect Alzheimer's disease in the blood. Cassava obtained nearly $18 million in funds from NIH to pursue their work on PTI-125 and SavaDx. The Government is investigating whether the scientific evidence submitted to NIH in support of these grants may have been falsified. The Government issued a Civil Investigative Demand ("CID") for the testimony of Dr. Wang to take place in Philadelphia, where Dr. Wang resides. Dr. Wang was served with a CID nearly two months before his testimony, and expressly agreed to appear on July 2, 2026, to provide testimony. However, on the evening of July 1, 2026—the evening before his scheduled testimony—Dr. Wang moved to set aside the CID. Without having obtained a Court order excusing his absence, Dr. Wang then failed to appear to provide testimony on July 2.

Dr. Wang's motion to set aside the CID (the "Motion") should be denied. Dr. Wang is *the* critical witness who can shed light on whether scientific evidence submitted to NIH in support of the grant applications at issue was false. Cassava relied heavily on the work of Dr. Wang's laboratory to show the effectiveness of PTI-125 and SavaDx. The Government is evaluating

whether Dr. Wang falsified Western blot images and ELISA tests, which are experiments designed to measure the amount of proteins (including biomarkers) in a sample, that were used to evaluate the effectiveness of Cassava's drug products in treating or detecting Alzheimer's disease. The FCA permits the Government to confront Dr. Wang with documents obtained during its investigation and ask him questions about them.

Dr. Wang seeks to avoid answering questions by claiming that the Government's Civil Fraud Investigation is not necessary in light of actions undertaken by other agencies. But as explained below, no other agency is charged with enforcing the False Claims Act and recovering damages and penalties on behalf of the United States for its violation. There is thus no unnecessary duplication of effort between the Government's Civil Fraud Investigation and the work of other agencies performed according to their specific mandates. While the Government sought documents from Dr. Wang in 2022 in connection with its Civil Fraud Investigation, it has not sought testimony from Dr. Wang in connection with that investigation until now. And although the Securities and Exchange Commission ("SEC") deposed Dr. Wang in connection with a separate and distinct securities fraud investigation, Dr. Wang invoked his Fifth Amendment right against self-incrimination because of a then-ongoing criminal investigation (that has since concluded), and declined to answer questions about Western blots and ELISA tests.

Scientific fraud is a scourge on the public fisc, and can endanger the lives of individuals subject to drug trials premised on false science. The Government should be permitted to take Dr. Wang's testimony in furtherance of its investigation into whether Dr. Wang and Cassava lied to NIH in procuring public funds, and whether they performed falsified experiments with those funds.

## BACKGROUND

### A. The Government's Civil Fraud Investigation

As Dr. Wang and Cassava officer Lindsay Burns wrote in a 2017 article published in the Journal of Neurobiology of Aging, the "most frequent cause of dementia, Alzheimer's disease (AD) is a devastating neurodegenerative disorder with an enormous health care burden and no disease-modifying treatment." Neurobiology of Aging 55 (2017) 99-114 (attached to the Declaration of Lawrence Fogelman, dated July 24, 2026 (the "Fogelman Declaration") as Exhibit ("Ex.") A) (the "2017 Article"). Drs. Wang and Burns presented findings in that and other scientific journal articles purportedly demonstrating that a drug called Simufilam, also referred to as PTI-125, "is a novel drug candidate" for the treatment of Alzheimer's disease. *Id.* Dr. Wang and Cassava also worked together on a blood test that would purportedly detect the presence of Alzheimer's disease. *See, e.g., SavaDx, a Novel Plasma Biomarker to Detect Alzheimer's Disease, Confirms Mechanism of Action of Simufilam* (Fogelman Declaration Ex. B) (poster presentation regarding SavaDx).

Relying on Western blot test results and ELISA test results in both preclinical mouse model studies and human clinical trials, Dr. Wang and Cassava purportedly demonstrated the prospect that PTI-125 could treat Alzheimer's disease and that SavaDx could successfully detect Alzheimer's disease. With Dr. Wang's "magic hands" – a description included in an email by Cassava officer Dr. Burns regarding Dr. Wang (*see* Fogelman Declaration Exhibit C) – involved in much of the relevant experimentation that featured prominently in NIH grant applications, Cassava obtained $17,809,563 in public grant funds from NIH. *See* Summary of Grants (Fogelman Declaration Ex. D).

The Government has been investigating this possible fraud since 2021. The Government served CIDs seeking documents on multiple individuals and entities, including but not limited to Dr. Wang, Cassava and the City University of New York ("CUNY"), where Dr. Wang performed his experiments. The Government issued a CID to Dr. Wang seeking documents on July 14, 2022, and expressly advised him that the Government was investigating his conduct: "This investigation concerns whether Cassava Sciences, Inc. (and or its officers, employees or affiliates) and/or Dr. Hoau-Yan Wang submitted or caused to be submitted false claims for payment in connection with grants received from the National Institutes of Health relating to certain products to treat or detect Alzheimer's Disease." *See* Motion Exhibit N. There is thus no basis for Dr. Wang's assertion that this Civil Fraud Investigation was "waiting in the wings" after the dismissal of the criminal case against him, Motion at 1, incorrectly implying that he was unaware of this Civil Fraud Investigation. The Government has also been working with an expert in the field of neuroscience, and specifically Alzheimer's disease, to help evaluate the scientific data and information accumulated through these documents.

The government is investigating whether the documentary evidence obtained to date has been falsified to make it look like PTI-125 effectively treated Alzhiemer's disease and SavaDX could detect Alzheimer's disease in the blood. However, basic questions about these documents remain, and Dr. Wang is the only person who can answer these questions since he performed many of the experiments. While the Government intends to question Dr. Wang about multiple experiments that he conducted, for purposes of this memorandum of law, the Government has selected one example that reflects the types of questions the Government intends to ask Dr. Wang under oath. Specifically, one focus of the testimony will be whether Dr. Wang falsified Western

blot images, published those falsified images in scientific journals, and, together with Cassava, included the falsified images in NIH grant application. In their scientific papers, Dr. Wang and Dr. Burns advanced a theory that a protein called filamin A ("FLNA") is conformationally altered (*i.e.*, the shape of the protein is changed) and cleaved (*i.e.*, the protein is cut into smaller pieces) in Alzheimer's disease, triggering a cascade of effects in the brain, and that Cassava's drug product PTI-125 restores FLNA to its normal structure and prevents that cascade of effects, potentially leading to symptomatic improvement in patients. *See* Wang HY *et al.*, *Reducing Amyloid-Related Alzheimer's Disease Pathogenesis b a Small Molecule Targeting Filamin A*, J. Neurosci. 32:9773-9784 (2012) (Fogelman Declaration Ex. E); Wang Y *et al.*, *PTI-125 Binds and Reverses an Altered Conformation of Filamin A to Reduce Alzheimer's Disease Pathogenesis*, Neurobiol. Aging 55:99-114 (2017) (Fogelman Declaration Ex. A). Figure 2 of the 2017 Article purports to show that FLNA has an altered conformation in the brain of an individual with Alzheimer's disease, and that PTI-125 reverses that conformational change in FLNA. *See* Exhibit A, Figure 2. Here is the relevant excerpt of Figure 2A of the 2017 article that purportedly supports this contention:




2017 Article, Figure 2A.

Figure 2A purports to show the results of a Western blot experiment. The first three columns of Figure 2A have a band reflecting FLNA in a control sample (human brain tissue without Alzheimer's disease), whereas bands 4 and 5 show that FLNA has a different conformation in a brain with Alzheimer's disease, as is indicated by the shift downward in where the bands appear. The sixth column purportedly shows a restoration of FLNA to resemble the non-Alzheimer's brain conformation of FLNA, at least in significant part, when Cassava's drug PTI-125 is present.

The Government is investigating whether Dr. Wang falsified this Western blot image in Figure 2A of the 2017 Article. The Government has obtained from Dr. Wang's files what appears to be an original scanned x-ray film image of this Western blot that does not reflect the protein bands depicted in Figure 2A of the 2017 Article.

USDOJ4-0000577259 - C-AD-FLNA conformation IEF.jpg



Fogelman Declaration Ex. F. This document appears to show the results of running eight Western blots. But notably, there are no visible, distinct protein bands on this x-ray that one would expect to see in a Western blot image; rather, the signal appears as more of a smear down each lane of the blot, and none of the bands depicted in the 2017 Article Figure 2A seem to appear in this image. There appears to be no way that this x-ray could have produced the content in Figure 2A of the 2017 Article. However, the metadata on this file reflects a file name that describes what this x-ray purports to show, *i.e.*, the conformation of FLNA: "C-AD-FLNA conformation IEF." *Id.*

Dr. Wang's electronic documents include *another* version of this same x-ray sheet, but this time it appears that Dr. Wang created a white box over part of the x-ray image, and in this white box included what appear to be crisp, clear protein bands. Remarkably, this x-ray has the same file

name as the prior x-ray shown above, but this time Dr. Wang added a "-11" at the end of the name of the document. It is thus saved as "C-AD-FLNA conformation IEF-11":

USDOJ4-0000441554 - C-AD-FLNA conformation IEF-11.jpg



*See* Fogelman Declaration Ex. G.

Placing these x-rays side by side show that not only do the x-rays have the same file name except for the added "-11" for the altered image, but also that they are identical other than the appearance of these two white boxes with what look like clearly defined protein bands from a Western blot superimposed over the original x-ray. Placing these x-rays side by side makes this plain to the naked eye: *See* Fogelman Declaration Ex. H (placing Exhibits F and G side by side):

It is this white box image in the top right corner of the "-11" x-ray film, and not the original x-ray image, that Dr. Wang and Dr. Burns include in Figure 2A of the 2017 article. The following image places side by side the white box image from the top right corner of Fogelman Declaration Exhibit G and Figure 2A from the 2017 Article to show that these are the same image:




Fogelman Declaration Ex. I (document placing Figure 2A and the white box image from the "-11" x-ray side by side to show that these are the same).

This white box image used in Figure 2A features prominently in multiple grant applications submitted to NIH, as demonstrated by the following excerpt from a Cassava grant application (from grant 2 R44AG056166-03) showing its inclusion of Figure 2A of the 2017 Article taken from Dr. Wang's white box image (as described above).



Contact PD/PI: Burns, Lindsay H.

2 R44AG056166-03

RESEARCH STRATEGY

A. SIGNIFICANCE

The worldwide Alzheimer's disease (AD) incidence was 46.8 million in 2015 and is estimated to double every 20 years to reach 74.7 million in 2030 and 131 million by 2050.[1] Although amyloid, particularly amyloid beta$_{1-42}$ (A$\beta_{42}$) is still considered a causative agent in AD, many amyloid-lowering therapies have failed in the clinic, casting doubt on "the amyloid hypothesis." Multiple factors may have contributed to these clinical failures, such as treating too late in the disease, as neuropathology can precede cognitive symptoms by as much as 25 years.[2] Additionally, because soluble A$\beta_{42}$ correlates more highly with cognitive decline than do Aβ deposits,[3] therapies clearing aggregated Aβ plaques are likely downstream of active pathology. Other research suggests that the greatest toxicity is conferred by A$\beta_{42}$ oligomers,[4] which therefore evade agents that primarily target Aβ monomers such as solanezumab. Importantly also, the large pool of soluble Aβ makes its removal mostly ineffective, and further, Aβ's putative physiological roles make removal possibly detrimental. Aβ has been shown to protect against microbial infection[5] and even play a role in neuronal survival, particularly under hypoxic stress.[6] An additional explanation for the failures of anti-amyloid antibodies is that A$\beta_{42}$ binds the α7-nicotinic acetylcholine receptor (α7nAChR) with ultra-high (high femtomolar) affinity,[7,8] creating substantial competition for therapeutic agents, which rarely bind their targets as tightly. Furthermore, this femtomolar binding of A$\beta_{42}$ (monomers or small oligomers) to α7nAChR is pathogenic in activating kinases to cause tau hyperphosphorylation and intraneuronal Aβ accumulation. The resulting neurofibrillary lesions erode axonal/dendritic transport and disrupt synaptic and neuronal function, leading to neurodegeneration and plaque formation. Although A$\beta_{42}$ binds several other targets, including PrP and neuroligin-1, their nanomolar or lower affinities suggest high off-rates and limited target engagement.

***PTI-125, a novel AD drug candidate***

PTI-125 is a novel small molecule AD therapeutic candidate that binds and reverses an altered conformation of the scaffolding protein filamin A (FLNA), which is induced by Aβ and critical to its toxicity. PTI-125 thus offers an alternative approach to reducing the toxicity of monomeric or oligomeric soluble Aβ without affecting its homeostasis. We first showed that the toxic signaling of A$\beta_{42}$ via α7nAChR requires the recruitment of FLNA to α7nAChR, a non-constitutive linkage that is induced by A$\beta_{42}$ and prevented or reversed by PTI-125.[17] We recently showed that the FLNA linking to α7nAChR is an altered conformation, evidenced by a shift in isoelectric focusing point. Fig. 1 shows this shift in postmortem human AD and control brain. The conformational shift is insensitive to complete dephosphorylation by alkaline phosphatase. PTI-125 preferentially binds and reverts aberrant FLNA to

Page 99

Research Strategy



Fogelman Declaration Exhibit J.

The Government intends to examine Dr. Wang about this series of x-ray images, how he created the white boxes, why he created the white boxes, why he used the white box images in journal articles, why he and Cassava used them in grant applications to NIH, why he did not disclose the original x-ray images like Fogelman Declaration Exhibit F to NIH, and why he did not disclose the original with the white boxes superimposed on top of the original like Fogelman Declaration Exhibit G to NIH. This is just one example of a potentially falsified image – the Government has additional evidence of manipulated images on which the Government intends to question Dr. Wang. The Government also intends to question Dr. Wang about potential falsification of ELISA studies he purportedly performed, and the potentially false claims made in grant applications to NIH based on these ELISA studies. The Government expects this testimony to shed light on whether Dr. Wang, Dr. Burns and Cassava falsified scientific data and submitted

falsified data to NIH that resulted in NIH paying out nearly $18 million, and whether they generated falsified data with grant funds from NIH.

**B. The Government's CID Seeking Testimony from Dr. Wang Is Not Duplicative of Any Other Investigation, Nor Has Any Other Agency Investigation Concluded That Dr. Wang Did Not Falsify Test Results**

Dr. Wang asserts that the CID is duplicative and "cumulative of information already obtained, reviewed, and analyzed through prior investigations and proceedings." Motion at 12. Dr. Wang suggests that the U.S. Food and Drug Administration ("FDA"), the Office of Research Integrity ("ORI") within the U.S. Department of Health and Human Services ("HHS"), CUNY, the SEC, and the Department of Justice's Criminal Division ("DOJ Criminal") have all already investigated him and found nothing concerning, such that the current CID for Dr. Wang's testimony is an "undue burden" (Motion at 10), "duplicative" (Motion at 10-11), "overlapping" (Motion at 11), of "minimal incremental investigative value" (Motion at 13), "oppressive" (Motion at 2, 15) and "harassing" (Motion at 2, 15). But each entity investigating Dr. Wang had a different mandate for its work, and none is duplicative of the Government's efforts to investigate whether Dr. Wang and Cassava committed violations of the False Claims Act.

Dr. Wang also attempts to impugn the Government's Civil Fraud Investigation by claiming that other entities have already cleared him of wrongdoing, purportedly rendering the Government's CID unnecessary. That is not the case. In fact, the investigations by the other entities produced evidence that, far from providing grounds to set aside the Government's CID, demonstrates all the more reason why the Government should be permitted to question Dr. Wang.

Finally, the testimony sought by the Government is not duplicative of any evidence that has already been gathered. There is no substitute for Dr. Wang's testimony concerning how he

generated the purported results of Western blots and ELISA tests. And as noted above, during the deposition taken by the SEC, Dr. Wang invoked his Fifth Amendment right against self-incrimination and declined to answer certain questions about Western blots and ELISA tests. *See* Fogelman Declaration Ex. L.

**1) The FDA Did Not Clear Dr. Wang of Wrongdoing and Instead Identified a Concerning Lack of Documentation**

Dr. Wang claims that the FDA investigated him and found nothing of significance in its review. As an initial matter, Dr. Wang claims that the FDA received a Citizen Petition (Motion Exhibit C) "seeking suspension of ongoing clinical trials involving simufilam by claiming, among other things, that Dr. Wang's western blotting techniques had been fabricated." Motion at 3. Dr. Wang then states that in February 2022, the "FDA denied the Citizen Petition." *Id.* But instead of citing to the actual denial of the Citizen Petition, Dr. Wang misleadingly cites only to a Cassava press release touting this dismissal. *Id.,* Motion Ex. D. Although Dr. Wang implies that the FDA's denial of the Citizen Petition amounts to a conclusion that there was no problem with his Western blotting techniques, in reality, the FDA denied the Petition "solely on the grounds that [the requests in the Citizen Petition] are not the appropriate subject of a citizen petition." Fogelman Declaration Ex. K. Accordingly, the FDA's denial of the Citizen's Petition does not reflect any finding that Dr. Wang did not falsify scientific testing results.

Dr. Wang also falsely asserts that the FDA cleared him of misconduct through its inspection of his laboratory at CUNY. Dr. Wang cites to the FDA's Establishment Inspection Report and Form 483, claiming that the FDA identified "eight observations relating to *procedural* issues" (emphasis added) and that the FDA "<u>did not</u> conclude that Dr. Wang engaged in scientific fraud, fabrication, falsification, or research misconduct." Motion at 3-4. But the purpose of an

FDA inspection is not to investigate fraud. Rather, the FDA's inspection of Dr. Wang's lab was intended to assure the quality and integrity of the data submitted to the agency for Dr. Wang's study of PTI-125, which included clinical trials of human blood and cerebrospinal fluid samples. *See* Declaration of Seongeun "Julia" Cho ("Cho Decl."), dated July 21, 2026, ¶¶ 4, 5. During an investigation, FDA investigators are instructed to note only what they observe during the course of the inspection itself, and the Form 483 generated by an FDA inspection "is not an all-inclusive list of every possible deviation from law and regulation." *See Id.* ¶ 9.

Further, rather than being merely "procedural" in nature, as Dr. Wang suggests, the FDA's inspection resulted in substantive findings concerning the reliability of Dr. Wang's data. *See Id.* ¶ 16. The FDA found, among other things, that Dr. Wang failed to validate or verify the ELISA tests used in his lab to measure the amount of protein present in a sample to ensure the accuracy, precision and sensitivity of the measurements taken during these tests. *Id.* ¶ 12. The FDA also found that Dr. Wang could not produce source records for his Western blot and ELISA experiments. *Id.* ¶ 13. This is not a mere "procedural" error, but rather a substantive issue relating to the reliability of Dr. Wang's data. *Id.* ¶ 16. Further, the purported lack of documentation during the FDA's inspection prevented FDA from reconstructing how the study under investigation was conducted. *Id.* ¶¶ 13, 16. Far from clearing Dr. Wang of wrongdoing, the FDA's inspection results thus create further concerns about the integrity and validity of the scientific experiments he conducted and that were included in grant applications to NIH.

**2) Neither CUNY Nor ORI Determined That Dr. Wang's Testing Results Were Not Falsified**

Dr. Wang incorrectly claims that "ORI had apparently agreed" with a finding by CUNY that "'Dr. Wang had **not engaged in research misconduct** as defined by CUNY policy' and had

not engaged in 'intentional, knowing, or reckless falsification and/or fabrication.'" Motion at 6 (emphasis in original). In fact, CUNY's investigation raised significant concerns about Dr. Wang's conduct, and ORI has not yet completed its own inquiry, much less reached any conclusion that Dr. Wang did not engage in research misconduct.

In response to a request from ORI, CUNY opened an inquiry into possible research misconduct by Dr. Wang. Declaration of Thomas Baird, dated July 21, 2026 ("Baird Decl.") ¶¶ 8-11. CUNY appointed a research misconduct committee (the "Committee") comprised of faculty to review 31 allegations of research misconduct made against Dr. Wang. *Id.* ¶ 12. CUNY asked the Committee to determine whether research misconduct did or did not occur. *Id.* When ORI requests that an institution conduct an investigation, ORI does not "agree" or "disagree" with the institution's findings – it reviews institutional findings in its oversight capacity to evaluate whether an institution acted in accordance with applicable regulation. Baird Decl. ¶ 2. ORI may also choose to make its own, separate findings. *Id.*

In Dr. Wang's case, the Committee submitted a response to ORI on June 1, 2023. Instead of submitting one final investigation report, CUNY submitted two reports, one of which had a file name that included "DRAFT Investigation Report" (the "Draft Report"), *see* Baird Decl. ¶ 13, Ex. 2, and the other of which had a file name that included "Final Report Clean" (the "Final Report"), *see* Baird Decl. ¶ 13, Ex. 3. The Draft Report included findings, by a preponderance of the evidence, of scientific misconduct by Dr. Wang. Specifically, the Draft Report states: "The committee has found that the preponderance of evidence supports the conclusion of knowing scientific misconduct by Dr. Wang for 14 of the 31 allegations." Baird Decl. Ex. 2 at 1. The Committee recommended "immediate editorial action be taken by the journals [in which Dr.

Wang's findings were published] to retract the publications in which the data in question appeared, if they have not already done so." *Id.* The Draft Report also concluded that Dr. Wang engaged in "long-standing and egregious misconduct in data management and record keeping." *Id.* The Committee found that "no primary data and no research notebooks exist." *Id.* The Committee observed that, on account of these issues, "even in the instances in which we have not found that a preponderance of evidence supports the conclusion of research misconduct, the integrity of Dr. Wang's work remains highly questionable." *Id.*

The Final Report appeared to adopt a different standard of proof than the preponderance of the evidence standard applied in the Draft Report but also raised significant concerns about Dr. Wang's research. The Final Report states that the "committee has found evidence highly suggestive of deliberate scientific misconduct by Dr. Wang for 14 of the 31 allegations." Baird Decl. Ex. 3 at 1. The Final Report also states that the Committee's investigation revealed "long-standing and egregious misconduct in data management and record keeping by Dr. Wang." *Id.* The Committee found that "the integrity of Dr. Wang's work remains highly questionable." *Id.* The Final Report, however, did not include the finding of knowing scientific misconduct by a preponderance of the evidence that had been included in the Draft Report, observing instead that "Dr. Wang's failure to provide underlying raw data or research records has prevented the committee from making definitive conclusions regarding misconduct." *Id.* at 46. The Committee also found that the "integrity of the data in majority of the allegations remains highly suspect." *Id.*

On June 22, 2023, ORI asked CUNY about the discrepancy between the Draft Report's findings of scientific misconduct and the Final Report's contention that the Committee could not make definitive conclusions. Baird Decl. ¶ 16. On June 26, 2023, CUNY sent an "addendum" to

the Final Report. *Id.* ¶ 17, Baird Decl. Ex. 4. The Addendum stated that, despite the Committee's frustration with Dr. Wang's "inability to provide a single datum or notebook in response to any allegation," the Committee decided that "it would be most conservative to conclude that" Dr. Wang's "failure to provide data or records prevented us from making an objective assessment in any case." *Id.* At the same time, the Committee concluded that "***Dr. Wang's inability or unwillingness to provide primary research materials to this investigation represents egregious misconduct***." *Id*. (emphasis in original). The Committee also found that "[t]his failure, the troubling research practices described in our report, and the clear indications of misconduct in his response to [a scientific journal's] editorial concerns, is highly suggestive of longstanding and deliberate scientific misconduct by Dr. Wang." *Id.*

On May 30, 2025, CUNY sent ORI a letter (the "University Final Letter") to "provide an update and final conclusions on its investigation." *See* Baird Decl. ¶ 21, Baird Decl. Ex. 1. This letter is not a further report from the Committee, but rather a letter from the University Executive Director of Research Integrity and Compliance. Baird Decl. Ex. 1 at 1. The University Final Letter recognized the Committee's finding in the Final Report "that the lack of preservation of research records represented a significant departure from accepted practices of the scientific community." *Id.* at 2. The University Final Letter also relayed that, based on the standard of proof it applied, the Committee "did not find that Dr. Wang's actions constituted acts of intentional, knowing, or reckless falsification and/or fabrication," and that on account of this, the Committee "concluded that Dr. Wang had not engaged in research misconduct as defined by CUNY policy." *Id* at 2. The University offered as explanation, however, that "the Committee may have misunderstood the relevant evidentiary standard in reaching its determination" and "may have applied a heightened

evidentiary standard that exceeds the preponderance of the evidence standard." *Id.* The University nonetheless adopted the findings of the Committee and concluded that for "each of the allegations of research misconduct, the University has determined that research misconduct did not occur based on the conclusions reached by the Committee in its Final Report, acknowledging that the Committee may have applied a heightened evidentiary standard." *Id.* at 2.

ORI's review of CUNY's investigation into research misconduct allegations at CUNY is currently ongoing, and ORI is still in the process of reviewing the materials that CUNY submitted to ORI. Baird Decl. ¶ 23. ORI has not made a final determination of what, if any, further actions to take. *Id.* ORI has not endorsed or agreed to any findings made by CUNY in its May 30, 2025, letter, *see id*. ¶ 24, as Dr. Wang asserted in the Motion.[1]

As discussed above, the Government has obtained what appear to be both original x-rays and falsified images of Western blots and supposed data stemming from ELISA tests. Based on the Committee's statement that Dr. Wang did not provide "a single datum or notebook in response to any allegation," Baird Decl. Ex. 4; Final Report at 46, it appears that these materials may not have been available to the Committee. At any rate, there is nothing in the University Final Letter, which recognized the Committee's finding that "that the lack of preservation of research records represented a significant departure from accepted practices of the scientific community," Baird Decl. Ex. 1 at 2, that vitiates the Government's need to obtain testimony from Dr. Wang. If

[1] In any event, irrespective of whatever decision ORI ultimately makes, ORI's activities are not a substitute or replacement for DOJ's Civil Fraud Investigation. In fact, ORI's governing regulation has a provision expressly permitting ORI to make a criminal or civil fraud referral to DOJ, and ORI is authorized to provide expertise and assistance to DOJ in investigating or pursuing research misconduct allegations or related matters. *Id.* ¶ 6 (citing 42 C.F.R. ¶ 93.401 (2005)).

anything, Dr. Wang's failure to provide *any* data to the Committee demonstrates that the testimony sought by the Government is not duplicative of the investigation conducted by CUNY, since the Committee apparently did not have access to the data and images obtained by the Government in the course of its Civil Fraud Investigation.

**3) Far from Clearing Dr. Wang of Wrongdoing, the SEC Took Action Against Dr. Wang and Cassava for Manipulating Scientific Data**

The SEC has a mandate to enforce the securities laws of the United States. It thus conducts its work in furtherance of different objectives than the Government's Civil Fraud Investigation in connection with a potential action under the FCA. Accordingly, nothing in the SEC's investigation and settlement of claims against Dr. Wang, Cassava, and executives of Cassava in any way obviates the need for the Government to take Dr. Wang's testimony as part of its Civil Fraud Investigation.

The SEC instituted and resolved cease-and-desist proceedings against Dr. Wang pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), and 21C of the Securities Exchange Act of 1934 ("Exchange Act") simultaneously. *See* Motion Exhibit H at 1-2. The resolution is contained in an Order Instituting Cease-And-Desist Proceedings Pursuant to Sections 8A of the Securities Act of 1933 and Section 21C of the Securities Act of 1934, Making Findings, and Imposing a Cease and Desist Order. *Id.* (the "Cease-and-Desist Order"). The SEC's findings state that Cassava claimed in SEC filings regarding the results of its Phase 2b clinical trial of PTI-125 that the patients who took the drug PTI-125 "showed significant improvement across every measured biomarker for Alzheimer's disease compared with patients who took a placebo," *id.* at 2, and that Cassava further claimed that these studies "were conducted under blinded conditions." *Id.* The SEC found that "[b]ecause of the conduct of Dr. Wang described herein, those claims were

false." *Id.* The SEC explained that Dr. Wang was "partially unblinded before he began running bioanalyses," that Cassava made misleading statements that all analyses were conducted under blinded conditions, and that "Dr. Wang manipulated the Phase 2b biomarker data, using the knowledge he gained through the unblinding process to show an exaggerated response to the treatment arms as compared to the placebo group." *Id.* at 5 ¶¶ 24-27. In other words, the SEC raised serious concerns regarding Dr. Wang's integrity regarding the conduct of this Phase 2b clinical trial.

Instead of acknowledging the seriousness of this conduct detailed by the SEC, Dr. Wang attempts to minimize it by arguing that he neither "admitted nor denied the [SEC's] findings," by claiming that he settled for a "nominal amount," and by claiming that his assertion of his Fifth Amendment right against self-incrimination during his deposition taken by the SEC "allowed the SEC to leverage a settlement based on the attendant adverse inference" from asserting his Fifth Amendment right not to answer questions. Motion at 5. But his attempt to distance himself from the conduct articulated by the SEC by claiming he never admitted to it and suggesting he was coerced into settling only further underscores the need for the Government to take Dr. Wang's testimony to have him answer questions under oath about his conduct in conducting scientific experiments that were submitted to NIH in procuring federal grants.

Nor can Dr. Wang call into question the seriousness of his conduct by claiming that he settled for a "nominal amount." While Dr. Wang settled this matter with the SEC for $50,000, Motion Ex. H. at 10, he fails to acknowledge how his conduct (such as how he was unblinded in the phase 2B study of PTI-125) was also included in allegations brought by the SEC in a separate lawsuit against Cassava, former CEO of Cassava Remi Barbier, and Cassava's former Senior Vice

President of Neuroscience Lindsay Burns. *See SEC v. Cassava Sciences, Inc. et al.*, 24 Civ. 1150 (W.D. Tex.) (the "SEC Lawsuit"), Dkt. 1. And the SEC ultimately resolved these allegations through a $40 million settlement with Cassava and additional settlements with its officers. *See* SEC Lawsuit, Dkt. No. 5 (final judgment as to Cassava holding Cassava liable for $40 million); Dkt. No. 6 (final judgment as to Remi Barbier holding him liable for a civil penalty of $175,000, and barring him for five years from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act or that files reports under Section 15(d) of the Exchange Act); Dkt. No. 7 (final judgment as to Lindsay Burns holding her liable for a civil penalty of $85,000, and barring her for three years from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act or that files reports under Section 15(d) of the Exchange Act); *see also* https://www.sec.gov/newsroom/press-releases/2024-151 (SEC press release).

At any rate, the SEC's investigation is not a substitute for or duplicative of the Civil Fraud Investigation. Any depositions taken by the SEC would necessarily be in furtherance of examining potential violations of the Securities Act and the Exchange Act under the SEC's purview, which are inherently different inquiries from the potential violations at issue in the Government's Civil Fraud Investigation relating to grant fraud. Additionally, when the SEC attempted to question Dr. Wang on the topics of Western blots and ELISA tests, which are an important focus in the Government's Civil Fraud Investigation, he invoked his Fifth Amendment right against self-incrimination and declined to answer. *See* Fogelman Decl. Ex. L. Accordingly, there has been no testimony from Dr. Wang on key issues about which the Government intends to question him. Moreover, the SEC deposition of Dr. Wang did not address all of the evidence adduced in the Civil

Fraud Investigation relating to the phase 2b study that the Government intends to ask him to explain. Also, the Government's Civil Fraud Investigation goes well beyond the phase 2b study addressed by the SEC in the Cease-and-Desist Order.

**4) The Dismissal of DOJ Criminal's Case Does Not Detract from the Government's Need to Take Dr. Wang's Testimony**

Dr. Wang's characterization of the impact of the resolution of DOJ's criminal case against him is likewise incorrect. "'The civil and regulatory laws of the United States frequently overlap with the criminal laws, creating the possibility of parallel civil and criminal proceedings, either successive or simultaneous.'" *United States v. Witmer*, 835 F. Supp. 208, 224 (M.D. Pa. 1993) (citing *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375 (D.C. Cir.)), *aff'd*, 30 F.3d 1489 (3d Cir. 1994). As relevant here, in June 2024 (approximately two years after the U.S. Attorney's Office for the Southern District of New York ("SDNY") served a CID on Dr. Wang for documents in connect with its Civil Fraud Investigation), a Grand Jury in the District of Maryland charged Dr. Wang with major fraud against the United States (18 U.S.C. §§ 1031(a) and 2), wire fraud (18 U.S.C. §§ 1343 and 2), and false statements (18 U.S.C. §§ 1001 and 2), in connection with fraudulent statements made in NIH grant applications. Motion Ex. B.

The trial in the criminal matter was scheduled to commence on October 20, 2025, and on that day the judge made a *Brady* ruling that expanded the government's discovery obligations to include ORI and also continued the start of the trial for one week. *United States v. Wang*, 24 Cr. 211 (TDC), Oct. 20, 2025 Transcript at 9-14 (Fogelman Declaration Ex. M). Following this ruling, on October 22, 2025, the Government filed a consent motion to dismiss the indictment. Dkt. 139. The following day, the prosecutor explained to the court that the primary reason for the dismissal was the government's difficulties in obtaining the ORI materials within the deadlines set by the

court to meet its statutory and constitutional discovery obligations, particularly from individuals on furlough because of the lapse in government appropriations at the time. Motion Ex. L (Oct. 23, 2025 Tr.) at 6-8, 10. The judge in the criminal matter expressly stated that "other than a continuance, there was no adverse ruling regarding *Brady.*" *Id.* at 4:10-11. And the judge further explained that he "d[id] not take the view that there was bad faith associated with" the Government's conduct and he gave the government "credit for trying to look for this other information, and even without having it, reach the conclusion that it was not in the interest of justice to proceed further." *Id.* 17:22-18:2.

The Government's decision to dismiss the criminal case against Dr. Wang has no impact on the SDNY's ability to continue its civil investigation of Dr. Wang and Cassava. Courts have found that "resolution of criminal charges in favor of a criminal defendant does not bar subsequent civil or administrative proceedings concerning the same underlying misconduct." *Gilarno v. Borough of Freedom*, 462 F. App'x 177, 180 (3d Cir. 2012) (citation omitted); *accord Nosik v. Singe*, 40 F.3d 592, 596 (2d Cir. 1994) ("Nothing in the Constitution forbids contemporaneous civil and criminal proceedings concerning the same subject matter."); s*ee also McKnight v. Sch. Dist. of Philadelphia*, 105 F. Supp. 2d 438, 444 (E.D. Pa. 2000) ("[R]esolution of criminal charges in favor of a defendant does not bar subsequent civil or administrative proceedings concerning the very same underlying misconduct."); *Alvarez v. Tropicana Hotel & Casino,* No. 15-2061 (NLH), 2015 WL 9216584, at *3 (D.N.J. Dec. 17, 2015) (collecting cases holding that criminal acquittal does not collaterally estop civil action).

Importantly, criminal and civil proceedings have different liability provisions and different burdens of proof. Accordingly, even an acquittal on a criminal charge "does not prove that the

defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt." *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361 (1984); *accord Helvering v. Mitchell*, 303 U.S. 391 (1938). And notably, in the civil case, the Government will have the testimony of Dr. Wang himself. *See United States v. Ianniello*, 646 F. Supp. 1289, 1290–91 (S.D.N.Y. 1986), *aff'd*, 824 F.2d 203 (2d Cir. 1987) (noting that in a civil case "the Government will have at its disposal significant evidence unavailable to it in the criminal case").

### C. Dr. Wang Expressly Agreed To Provide CID Testimony on July 2 and Filed the Motion the Evening Before His Testimony

The Government sent a CID for the testimony of Dr. Wang by e-mail dated May 1, 2026. *See* Fogelman Declaration Ex. N-1. The scheduled date on the CID for Dr. Wang's testimony was June 3, 2026. The CID contained a rider with a detailed explanation of the general purpose of the demand for oral testimony, as well as an identification of the primary areas of inquiry with nine enumerated items. *See id.* On May 4, 2025, Dr. Wang's attorney agreed to accept service of the CID by e-mail and stated that she would get back to the Government about scheduling. *See* Fogelman Declaration Ex. N-2.

Over the next several weeks, Dr. Wang's counsel and the Government exchanged multiple e-mails concerning the date, location and logistics of Dr. Wang's testimony. At no point in those e-mail communications did Dr. Wang's counsel raise any substantive objection to the CID itself, including with respect to the topics of inquiry identified by the Government. The Government accommodated the scheduling requests of Dr. Wang and his counsel by offering several possible dates to obtain his testimony.

By e-mail dated June 10, 2026, the Government asked if July 2 would work for Dr. Wang and his counsel to take Dr. Wang's testimony. Fogelman Declaration Ex. N-5. The next day, June

11, 2026, Dr. Wang's counsel responded: "Yes, that works for us. Would you mind reissuing the CID with the new date?" Fogelman Declaration Ex. N-6. Nowhere in this e-mail exchange did Dr. Wang's counsel raise any concerns about the CID. In response to the request from Dr. Wang's counsel, on June 22, 2026, the Government issued a CID with the agreed July 2 date and provided an updated address in Philadelphia where the testimony would take place. This CID identified the same topics for testimony as the initial CID. *See* Fogelman Declaration Ex. N-7.

Dr. Wang's counsel did not advise the Government that Dr. Wang intended to move to set aside the CID until June 30, 2026 at 5:59 p.m., nearly two months after receiving the CID. *See* Fogelman Declaration Ex. N-8. Dr. Wang's counsel sent the e-mail so informing the Government less than 39 hours before the scheduled start time for Dr. Wang's testimony, after travel arrangements had been made and a court reporter and videographer had been booked and scheduled to be present. The June 30 email did not identify any basis for the intended motion to set aside the CID.

The Government did not receive Dr. Wang's motion to set aside the CID until the evening before the scheduled CID testimony, on July 1, at approximately 5:54 p.m. Fogelman Declaration Ex. N-9. Dr. Wang did not seek or obtain any interim relief from the Court that would have excused his attendance pursuant to the CID. The Government responded that it planned to proceed as scheduled with the CID testimony of Dr. Wang and that, if he did not appear, the Government would seek appropriate relief. *See* Fogelman Declaration Ex. N-10. Dr. Wang's counsel offered to talk at 9:42 pm, *see* Fogelman Declaration Ex. N-11, but also indicated that she had not boarded a plane to traveled to Philadelphia for Dr. Wang's testimony. *See* Fogelman Declaration Ex. N-12. The Government responded that since there had been no Court ordered relief in response to the

late filed Motion, the CID remained operative, and Dr. Wang was obligated to provide testimony as scheduled. *See* Fogelman Declaration Ex. N-13.

Dr. Wang did not appear for the deposition on July 2, 2026. The Government received an email that morning from Dr. Wang's counsel stating that she was "out of state" and would not attend. *See* Fogelman Declaration N-14. The Government made a statement on the record after Dr. Wang and his counsel failed to appear on the morning of July 2, 2026. *See* Fogelman Declaration Ex. O (transcript with exhibits).

Dr. Wang's failure to disclose his intention to make the Motion until less than 39 hours before the scheduled CID testimony resulted in the Government incurring significant fees in hiring a court reporter and videographer, and for travel expenses. Those expenses and unnecessary travel could have been avoided if Dr. Wang had sought to meet and confer with the Government to agree on a briefing schedule over Dr. Wang's anticipated motion instead of failing to disclose their intent to file until just before the scheduled testimony.

## LEGAL STANDARDS

The FCA authorizes the Attorney General, or a designee, to issue a CID to any person that he has "reason to believe . . . may be in possession, custody, or control of … information relevant to a false claims investigation" including "to give oral testimony concerning such documentary material or information." 31 U.S.C. § 3733(a)(1)(C). In enacting the statutory authority to issue CIDs under the FCA, Congress intended to "enable the Government to determine whether enough evidence exist[s] to warrant the expense of filing [a civil] suit, as well as to prevent the potential Defendant from being dragged into court unnecessarily." H.R. Rep. 660, 99th Cong., 2d Sess. 26 (1986). The FCA provides that the government may file a petition with the district court for enforcement of a CID whenever a person fails to comply with the CID, 31 U.S.C. § 3733(j)(1),

and permits any person who has received a CID to file a petition for an order of the court to modify or set aside the CID within "20 days after the service date of the CID, or at any time before the return date specified in the demand, whichever date is earlier, *id.* § 3733(j)(2).

A CID under the FCA is a type of administrative subpoena, and the standard for summary enforcement of an administrative subpoena applies to a petition to enforce under the FCA. *See United States v. Witmer*, 835 F. Supp. 208, 213, 220-21 (E.D. Pa. 1993) (analyzing petition to set aside FCA CID and cross-motion to enforce CID under administrative subpoena standards), *aff'd* 30 F.3d 1489 (3d Cir. 1994); *United States v. Jefferson,* Civ. No. 25-1931 (ESK/SAK), 2025 WL 1583041, at *1 (D.N.J. May 20, 2025) ("Court review of a petition to enforce a CID is narrow. In this context a CID [issued under the FCA] is analyzed in a similar manner as an administrative subpoena."), *adopted* 2025 WL 1581314 (D.N.J. June 4, 2025); *see also United States v. Markwood*, 48 F.3d 969, 975-76 (6th Cir. 1995) (affirming district court's application of the standard for enforcing administrative subpoenas to a petition to enforce a CID under 31 U.S.C. § 3733(j)); *United States v. Anthem, Inc.*, No. 18 MC 379 (GBD) (KNF), 2018 WL 11613957, at *7 (S.D.N.Y. Nov. 13, 2018), *adopted* 2019 WL 13443953 (S.D.N.Y. Feb. 4, 2019) ("Federal courts that have addressed enforcement of civil investigative demands, including FCA civil investigative demands, have applied the judicially-created standard for enforcement of administrative subpoenas to determine whether enforcement is warranted.").

As the Third Circuit has instructed, "judicial review of administrative subpoenas is 'strictly limited.'" *Univ. of Med. & Dentistry of New Jersey v. Corrigan*, 347 F.3d 57, 64 (3d Cir. 2003) (quoting *FTC v. Texaco*, 555 F.2d 862, 871-72 (D.C. Cir. 1977); *see also Jefferson,* 2025 WL 1583041, at *1; *Witmer*, 835 F. Supp. at 220; *United States v. AGS Solutions Corp*., No.: 17 Civ.

1224 L (BGS), 2018 WL 1418023, at *4 (S.D. Cal. Mar. 22, 2018) (the "scope of judicial review" of an FCA CID "is quite narrow") (citations omitted), *adopted* 2018 WL 3471405 (July 18, 2018). Courts have rejected "attempt[s] [by CID recipients] to 'try the prosecutor,'" noting that "these dilatory and obfuscatory tactics should not be condoned or encouraged by the courts," particularly "in the context of CIDs which were specifically intended to permit the Justice Department to carry out its pre-complaint investigatory functions in an efficient and cost-effective manner." *Witmer*, 835 F. Supp. at 213 (internal citations omitted).

Applying this narrow review, the court enforces a CID as long as the Government can show (i) that "the investigation will be conducted pursuant to a legitimate purpose," (ii) "that the inquiry may be relevant to the purpose," (iii) "that the information sought is not already within the [Government's] possession," and (iv) "that the administrative steps required by the [statute] have been followed." *United States v. Powell*, 379 U.S. 48, 57-58 (1964) (articulating the standard of review for enforcing an administrative subpoena issued by the Internal Revenue Service) (the "*Powell* Factors"); *see also F.D.I.C. v. Wentz,* 55 F.3d 905, 908 (3d Cir. 1995); *Corrigan*, 347 F.3d at 64; *Jefferson*, 2025 WL 1583041, at *1; *Witmer*, 835 F. Supp. at 220. "The [CID recipient] opposing enforcement must shoulder the burden of showing that the subpoena is unreasonable or was issued in bath faith or for an improper purpose or that compliance would be unnecessarily burdensome." *Anthem*, 2018 WL 11613957, at *8; *see also Powell*, 379 U.S. at 58 ("The burden of showing an abuse of the court's process is on the [subpoena recipient]."); *Wentz*, 55 F.3d at 908 ("The subpoenaed party bears the heavy burden of establishing an abuse of the court's process.").

## ARGUMENT

Dr. Wang offers no valid reason to set aside the CID. The Court should thus deny Dr. Wang's Motion to Set Aside and issue an order requiring Dr. Wang to appear and give testimony pursuant to the CID since the Government has met all of the *Powell* factors. The Government's Civil Fraud Investigation is for a legitimate purpose, as the Government is evaluating whether Dr. Wang and Cassava violated the False Claims Act in connection with grants applied for from NIH, and in the use of grant funds awarded by NIH. Dr. Wang's testimony is central to the Government's evaluation of violations of the False Claims Act as he conducted many of the experiments that were key to Cassava obtaining federal funds from NIH. The Government does not already have this information – the Government has not taken Dr. Wang's testimony in connection with its Civil Fraud Investigation. And the Government has complied with all procedural requirements. Accordingly, the Court should deny Dr. Wang's Motion and Dr. Wang should be ordered to testify.

### I. The Government's Investigation is Conducted for a Legitimate Purpose

The FCA provides civil remedies to the Government for "all fraudulent attempts to cause the Government to pay out sums of money." *United States v. Neifert-White, Co*., 390 U.S. 228, 233 (1968). The FCA has long been an important tool employed by the Government to combat fraudulent conduct related to research performed in connection with Government grants, including NIH grants like the one at issue here. *See, e.g.,* https://www.justice.gov/archives/opa/pr/duke-university-agrees-pay-us-1125-million-settle-false-claims-act-allegations-related ($112.5 million FCA settlement with Duke University related to applications and progress reports that contained falsified research on NIH and Environmental Protection Agency grants). Indeed, Brenna E. Jenny, Deputy Assistant Attorney General for the Department of Justice's Civil Division, recently testified at the U.S. House of Representatives Science, Space, and Technology Hearing about the

"steps the U.S. Department of Justice (Department), Civil Division is taking to combat fraud involving federal research grants," explaining that "[t]he FCA is the government's primary civil tool to recover losses due to fraud and abuse by persons seeking payment from the United States." https://www.justice.gov/ola/media/1449206/dl?inline (June 24, 2026). She further noted that the "Civil Division has multiple active investigations reviewing allegations of falsified or manipulated images that were used in grant applications," noting that, "[f]or example, a cancer research and treatment center paid $15 million to resolve allegations that the center used funds from six NIH grants to conduct research that resulted in 14 publications in scientific journals containing misrepresented and/or duplicated images and data." *Id.*; *see also*, https://www.justice.gov/opa/pr/dana-farber-cancer-institute-agrees-pay-15m-settle-fraud-allegations-related-scientific (press release dated December 16, 2025, regarding the cancer treatment and research center grant fraud referenced above).[2]

The Government is likewise investigating whether Dr. Wang and/or Cassava committed grant fraud. Cassava has obtained nearly $18 million in NIH grants, and the Government is evaluating whether Dr. Wang and/or Cassava generated and provided false scientific evidence to NIH to obtain those funds, and whether those funds were used to generate falsified scientific evidence. This investigation thus falls squarely within the Department of Justice's mandate to

---

[2] *See also* https://www.justice.gov/archives/opa/pr/athira-pharma-inc-agrees-pay-4m-settle-false-claims-act-allegations-related-scientific (press release dated January 6, 2025, addressing resolution of allegations that a company violated the False Claims Act by failing to report allegations of research misconduct to NIH and ORI in grant applications and grant award progress reports and assurances); https://www.justice.gov/usao-ma/pr/partners-healthcare-and-brigham-and-women-s-hospital-agree-pay-10-million-resolve (press release dated April 27, 2017, addressing resolution of allegations that a stem cell research laboratory fraudulently obtained grant funding from NIH).

enforce the False Claims Act.

## II. The Testimony Sought Is Relevant to the Matters Under Investigation and Is Not Already in the Government's Possession

"'Courts traditionally give wide latitude in determining relevance in the context of an administrative subpoena,'" and "'administrative subpoenas must be enforced if the [information] sought could be pertinent to a legitimate agency inquiry.'" *Nat'l Lab. Rels. Bd. v. Jo-Dan Madalisse Ltd, LLC,* No. 15-MC-00228, 2015 WL 9302922, at *3 (E.D. Pa. Dec. 22, 2015) (quoting *United States v. O'neill*, 619 F.2d 222, 228 (3d Cir. 1980)); *see also N.L.R.B. v. Am. Med. Response, Inc.,* 438 F.3d 188, 193 (2d Cir. 2006) ("In enforcing administrative subpoenas, courts broadly interpret relevancy."). "Courts 'defer to the [Government's] appraisal of relevancy, which must be accepted so long as it is not obviously wrong.'" *Anthem*, 2018 WL 11613957, at *7–8 (alteration in original, quoting *In re McVane*, 44 F.3d 1127, 1135 (2d Cir. 1995)); *Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colleges & Schs.,* 183 F. Supp. 3d 79, 81–82 (D.D.C. 2016) ("[A]gencies are generally accorded broad deference both in their interpretation of the scope of their authority and their estimation of the relevance of requested records."), *aff'd,* 854 F.3d 683 (D.C. Cir. 2017). The court cannot "substitute its judgment for that of the Attorney General. To the contrary, the [FCA] statutory scheme appears to leave to the discretion of the Attorney General the decision whether issuance of a CID is necessary." *Witmer*, 835 F. Supp. at 218.

The Government has provided the Court with specific details demonstrating the relevance and importance of Dr. Wang's testimony, *see* Background Section A, *supra*. Dr. Wang personally developed much of the scientific evidence that he and Cassava relied on in publishing articles in scientific journals touting the potential benefits of PTI-125 and in seeking funding from NIH. The

Government requires Dr. Wang's testimony to explain how this evidence was generated, which will shed light on whether it is false. For example, the Government is investigating whether Dr. Wang may have taken Western blot images captured on x-rays, superimposed white boxes on top of them, and inserted what appear to be bands of proteins that cannot be detected on the original x-ray images themselves. Dr. Wang and Dr. Burns then published these images in scientific journals and relied on them in seeking NIH funding for Cassava. The Government also seeks Dr. Wang's testimony on his ELISA studies that purportedly showed the effectiveness of PTI-125 but may also have been falsified.

Contrary to Dr. Wang's suggestion, he has *never* provided answers to the Government's questions concerning how he generated the white box images on the Western blots. Although the SEC took his deposition, Dr. Wang invoked his Fifth Amendment right against self-incrimination and refused to answer any questions on the topic of Western blots. *See* Fogelman Declaration. Ex. L. He likewise refused to answer questions about ELISA tests. *Id.* Now that Dr. Wang's criminal case has been dismissed with prejudice, nothing prevents him from answering these essential questions. Moreover, the SEC's investigation concerned violations of the Securities Act and the Exchange Act, not the False Claims Act.

## III. The Government Has Complied with the Administrative Steps Required by Statute

The Government has complied with the administrative steps set forth in 31 U.S.C. § 3733 in issuing the CID. In accordance with 31 U.S.C. § 3733(a)(1), the Government obtained authorization from the U.S. Attorney on April 30, 2026, before issuing a CID to Dr. Wang, *see* Fogelman Decl. ¶ 1, pursuant to a delegation of authority from the United States Attorney General. *See* Redelegation of Authority of Asst. Atty. Gen., Civil Div., to Branch Dirs. Heads of Offices and United States Attys. in Civil Div. Cases, 75 Fed. Reg. 14070-72 (March 24, 2010). On May

1, 2026, the Government sent a CID seeking Dr. Wang's testimony to his counsel, who agreed to accept service of the CID on May 4, 2026. *See* Fogelman Declaration Exs. N-1, N-2, P. After the parties negotiated a revised date of July 2, 2026 for the testimony, the Government issued a replacement CID at the request of Dr. Wang's counsel. This replacement CID complied with the requirements of 31 U.S.C. § 3733(a)(2)(D). Specifically, this CID:

- set the date, time, and location for the testimony;
- identified AUSAs Lawrence Fogelman and Dominika Tarczynska as the false claims act investigators who shall conduct the examination;
- identified Lawrence Fogelman as the custodian to whom the transcript of such examination shall be submitted;
- stated that Dr. Wang's attendance and testimony are necessary to the conduct of the False Claims Act investigation described in the CID;
- stated that Dr. Wang had the right to be accompanied by an attorney or other representative during the oral examination;
- explained that the general purpose of the CID for oral testimony is to gather evidence in connection with a False Claims Act investigation concerning whether Dr. Wang and/or Cassava submitted or caused to be submitted false claims, false records, or false statements in connection with grants received from NIH relating to certain products intended to treat or detect Alzheimer's Disease; and
- attached a rider listing the primary areas of inquiry.

*See* Fogelman Declaration Ex. Q. Accordingly, the Government complied with all administrative steps in issuing the CID requiring Dr. Wang's testimony on July 2, 2026. Dr. Wang does not argue otherwise.

### IV. Dr. Wang Has Not Shown That It Is Unreasonable or Unduly Burdensome to Require Him to Provide Testimony

Dr. Wang attempts to argue that the CID should be set aside by relying on precedent from the civil discovery context which is inapplicable in the context of an administrative subpoena, *see* Motion at 10-13, while failing to demonstrate that the Government has not complied with the *Powell* Factors as described above, *see* Argument Sections I-III. Moreover, in addition to using the wrong standard, Dr. Wang's argument is based on the factual predicate that "the CID seeks testimony concerning substantially the same alleged misconduct theories" raised in other proceedings by DOJ, the SEC, the FDA, HHS/ORI, and CUNY. Motion at 11. But each of these separate investigations stemmed from different types of governmental activities described in detail in Background Section B, and do not provide a basis to prevent the Government from questioning Dr. Wang as part of its Civil Fraud Investigation, which no other governmental agency has authority to undertake.

First, Dr. Wang's attempt to rely on case law from the civil discovery context under Federal Rule of Civil Procedure 26 and 45, *see* Motion at 10-13, is misplaced. Courts have made clear that the recipients of administrative subpoenas face a much higher hurdle to set aside CIDs and other administrative subpoenas than are applicable in civil discovery. *See, e.g., United States v. Joint Active Sys., Inc.,* No. CV 19-MC-91053-ADB, 2020 WL 9747630, at *4 (D. Mass. May 20, 2020) (noting that "a much stronger showing of 'undue burden' is required [for an administrative subpoena] than in the case of Rule 45 subpoena"); *adopted*, 2020 WL 9748373 (D. Mass. Oct. 7,

2020); *Natures Image, Inc. v. U.S. Dep't of Lab*., No. 8:19-mc-00014-DOC-KESx, 2019 WL 4316514, at *1 (C.D. Cal. June 19, 2019) ("Rule 45 does not apply to administrative subpoenas"); *United States v. Cross Senior Care, Inc., LLC*, No. 8:19-MC-8-T-33TGW, 2019 WL 11502849, at *7–8 (M.D. Fla. Nov. 6, 2019) ("[A] district court must enforce the subpoena if the information sought there is not plainly incompetent or irrelevant to any lawful purpose of the agency. This standard is considerably broader than the permissible scope of discovery under Rule 26(b)" (internal citations omitted)), *adopted,* 2019 WL 11502798 (M.D. Fla. Dec. 18, 2019), *aff'd,* 831 F. App'x 944 (11th Cir. 2020).

Second, Dr. Wang is wrong in asserting that investigations undertaken by other federal components or by CUNY render the Governments' Civil Fraud Investigation unnecessary, or its request for testimony of Dr. Wang "cumulative" of evidence from other investigations. Motion at 12. Each of the investigations referenced by Dr. Wang had a specific purpose separate and distinct from the Government's Civil Fraud Investigation and is not duplicative of this Civil Fraud Investigation. Moreover, the findings of each of the investigations have called into doubt Dr. Wang's integrity, and further underscore the need for the Government to ask Dr. Wang questions under oath. *See supra* Background Section B.

The FDA, for example, explained that its investigation was to assure the quality and integrity of data submitted to the agency, and that it did not conduct a fraud investigation. *See* Cho Declaration ¶ 17. And the FDA's findings raised substantive concerns about Dr. Wang's work that "relate to the reliability of Dr. Wang's study data." *Id.* ¶ 16. Dr. Wang also misleadingly implies that the FDA cleared him of any wrongdoing by denying a Citizen Petition, and by citing not to that denial but rather only to a press release issued by Cassava where Cassava's President and CEO

Remi Barbier stated: "'We said from the outset that the allegations are false.'" Motion at 3, citing to Motion Exhibit D. An examination of the denial letter itself (conspicuously not attached to Dr. Wang's Motion) demonstrates that rather than reaching any kind of determination on the merits, the FDA stated that the "Petitions are being denied solely on the grounds that your requests are not the appropriate subject of a citizen petition." Citizen Petition Denial Letter, Fogelman Decl. Ex. K. at 3.

Likewise, ORI's work is "not a substitute or replacement for investigations conducted by the Department of Justice." Baird Decl. ¶ 6. In fact, ORI's regulations specifically provide for referrals to DOJ if ORI believes that a civil fraud violation has occurred. *Id.*, *see also* 42 C.F.R. § 93.401(a). Moreover, ORI's work is ongoing and has not cleared Dr. Wang of any research misconduct. *See* Baird Decl. ¶ 24 ("ORI has not endorsed or agreed to any findings made by the University in the University Final Letter, as Dr. Wang incorrectly stated in the Motion, and has not concluded that Dr. Wang did not engage in research misconduct"). Specifically, ORI is still in the process of reviewing the materials that CUNY submitted to it. *See* Baird Declaration ¶¶ 23-24.

Similarly, the findings of the Committee at CUNY investigating Dr. Wang raise substantial concerns about the integrity of his data and underscore the importance for the Government to take Dr. Wang's testimony under oath. The Final Report of the Committee stated that the "committee has found evidence highly suggestive of deliberate scientific misconduct by Dr. Wang for 14 of the 31 allegations." Baird Decl. Ex. 3. It further stated that the Committee's investigation revealed "long-standing and egregious misconduct in data management and record keeping by Dr. Wang." *Id.* The Committee found that "the integrity of Dr. Wang's work remains highly questionable." *Id.* In an addendum to the Final Report, the Committee expressed frustration with Dr. Wang's

"inability to provide a single datum or notebook in response to any allegation." Baird Decl. Ex. 4. The Committee also stated that "***Dr. Wang's inability or unwillingness to provide primary research materials to this investigation represents egregious misconduct***." *Id*. (emphasis in original). The Committee further found that "[t]his failure, the troubling research practices described in our report, and the clear indications of misconduct in his response to [a scientific journal's] editorial concerns, is highly suggestive of longstanding and deliberate scientific misconduct by Dr. Wang." *Id.* Likewise, the SEC's Cease-and-Desist Order calls into question Dr. Wang's integrity, as the SEC found that Dr. Wang "manipulated the phase 2b biomarker data," Motion Ex. H at 5 ¶ 26, further underscoring the need for the Government to examine Dr. Wang under oath.

In short, far from rendering the Government's CID for Dr. Wang's testimony unnecessary or improper, all of these investigations demonstrate the importance and need for Dr. Wang to provide testimony under oath in furtherance of the Government's Civil Fraud Investigation.

There is likewise nothing duplicative or cumulative about the Government taking testimony from Dr. Wang. The Government has not taken Dr. Wang's testimony in its Civil Fraud Investigation. While the SEC did conduct a deposition of Dr. Wang, the SEC's focus was on violations of the Securities Act and Exchange Act in connection with false statements made to investors. *See* Cease-and-Desist Order. The Government's focus in this Civil Fraud Investigation is on possible violations of the False Claims Act relating to NIH grants. In addition, Dr. Wang asserted his Fifth Amendment right not to answer questions about Western blotting and ELISA tests during the SEC's deposition. The Government's Civil Fraud Investigation has also adduced

evidence that was not raised during the SEC's deposition, and goes well beyond the phase 2b study referenced in the SEC's Cease-and-Desist Order.

## V. Dr. Wang's Assertion That the CID Is "Harassing" Is Without Merit

Dr. Wang's argument that the CID is an "oppressive and harassing use of compulsory process," suggesting that the Government is trying to "take advantage of the adverse inference by forcing Dr. Wang to again assert his Fifth Amendment rights," Motion at 15-17, is entirely without basis. As explained above, the Government is free to pursue parallel criminal and civil proceedings and there is nothing improper about the SDNY taking Dr. Wang's testimony after the conclusion of his criminal proceeding. Indeed, had the government issued a CID for testimony to Dr. Wang while he was still facing criminal charges, he would likely have invoked his Fifth Amendment right against self-incrimination and refused to answer any questions—as he did with the SEC. *See, e.g., SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375–76 (D.C. Cir. 1980) (noting that among the reasons for deferring civil proceedings until after completion of criminal proceedings is the defendant 5th Amendment privilege against self-incrimination); *S.E.C. v. Saad*, 384 F. Supp. 2d 692, 693–94 (S.D.N.Y. 2005) (staying certain depositions until resolution of criminal matters explaining that "prior to the conclusion of the criminal case, [witnesses] would invoke the Fifth Amendment privilege against self-incrimination and refuse to testify substantively in the instant case, thus rendering the taking of their depositions prior to the conclusion of criminal case of little substantive value").[3]

---

[3] Dr. Wang cites *Witmer* as a case purportedly "addressing challenge to CIDs based on allegations that they were issued . . . to place respondents' Fifth Amendment invocation on the record." Motion at 9. The court did consider those arguments in that case, and it rejected them in their entirety, explaining that "the United States has no obligation to grant individual CID recipients immunity" and CID recipients must appear for oral examination and actually invoke their Fifth Amendment

Now that the criminal matter is concluded and Dr. Wang no longer faces criminal charges, the Government should be able to obtain answers to the questions that it intends to ask Dr. Wang about his conduct without risk that Dr. Wang will incriminate himself. *See Mitchell v. United States*, 526 U.S. 314, 326 (1999) ("[W]here there can be no further incrimination, there is no basis for the assertion of the privilege."); *In re Morganroth*, 718 F.2d 161, 167 (6th Cir. 1983) (finding that a witness asserting the Fifth Amendment privilege must show a real danger of incrimination, and "not a mere imaginary, remote or speculative possibility of prosecution").

The Court should not credit Dr. Wang's feigned surprise that the SDNY would seek his testimony in connection with its FCA investigation. *See e.g.,* Motion at 1, 16. Dr. Wang has known that he was the subject of an investigation under the FCA since July 2022 when he received a CID for documents expressly stating that fact. *See* Motion Exhibit N. Moreover, Dr. Wang's testimony is relevant not only to the Government's FCA investigation of Dr. Wang, but to its investigation of Cassava and its officers, employees or affiliates.

## VI. The Court Should Compel Dr. Wang To Appear and Provide Testimony

Because the Government has met the *Powell* Factors as described above, and Dr. Wang has not identified any valid basis for his failure to testify, the Government respectfully requests that the Court issue an order pursuant to 31 U.S.C. § 3733(j)(1) compelling Dr. Wang to testify

---

rights on a question-by-question basis. *Witmer*, 835 F. Supp. at 219. To the extent that Dr. Wang follows through on the threat in his brief to invoke his Fifth Amendment rights and refuse to answer the Government's questions about his conduct, Motion at 16, the Government could obtain an adverse inference and there would be nothing improper about it doing so. *See SEC v. Graystone Nash, Inc.,* 25 F.3d 187, 190 (3d Cir. 1994).

within one-month of the Court's order. Specifically, the Government requests that Dr. Wang provide four dates within the month following the Court's order when he is available to testify.

**CONCLUSION**

For the reasons set forth herein, the Government respectfully requests that the Court deny the Motion, grant the Government's Cross-Petition to compel Dr. Wang to testify, and grant any other relief that the Court deems just and proper.

Respectfully submitted,

JAY CLAYTON
United States Attorney for the
Southern District of New York

/s/ Lawrence H. Fogelman
LAWRENCE H. FOGELMAN
DOMINIKA TARCZYNSKA
Assistant United States Attorneys
for the Southern District of New York
Special Assistant United States Attorneys
for the Eastern District Pennsylvania
86 Chambers Street, 3rd Floor
New York, N.Y. 10021
lawrence.fogelman@usdoj.gov
Dominika.Tarczynska@usdoj.gov
212-637-2719/2748

DAVID METCALF
United States Attorney for the
Eastern District of Pennsylvania

/s/ Peter Carr
PETER CARR
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
peter.carr@usdoj.gov
215-861-8622

Dated: July 29, 2026