THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of: )
) File No. HO-14346-A
CASSAVA SCIENCES )

WITNESS: Hoau-Yan Wang
PAGES: 1 Through 196
PLACE: Securities and Exchange Commission
Department of Enforcement
100 F Street, NE
Washington, D.C. 20549
DATE: Tuesday, August 22, 2023

The above entitled matter came on for hearing, pursuant to notice, at 9:30 a.m.

Diversified Reporting Services, Inc.
(202) 467-9200

ligand available is carbon-14, and we use carbon-14.

Q Okay.

A It all depends on which radiolabel ligand is available in the particular situation.

Q Did you do any radio-ligand assay with respect to the drug known as pTI125? Did you do any radio-ligand binding assay with respect to a drug known as pTI125?

MS. BEIDEL: When he was at R.W. Johnson?

MR. AMPARO: At any time, sorry. At any time, I made a mistake about that. At any time.

THE WITNESS: Yes. Yes.

BY MR. AMPARO:

Q In this particular case, what is the ligand that was tied to C-14?

MS. BEIDEL: This is where you start using the advice.

THE WITNESS: Okay. On the advice, my -- advice of the counsel, I exercise my -- I'm exercising my Fifth Amendment right not to answer.

BY MR. AMPARO:

Q Dr. Wang, since you indicate that you would be, you know, invoking your Fifth Amendment privilege to one of our questions, I have to give you certain notices. The first is that I am not authorized to compel you to give evidence or testimony if you wish to assert your privilege against self-incrimination. I'm not going any further to try to get the answer to the question which remains pending to which you said you're exercising your right, and I won't do that, and I won't do it to any other questions that you'll be asserting your privilege under the Fifth Amendment to the Constitution. In addition, I don't have any authority to compel your testimony by granting you immunity from prosecution. We don't have that power. Any question that I ask hereafter will therefore be with the understanding that if you wish to assert your privilege to refuse to answer on the grounds of your -- if it might incriminate you, you need to merely state "I take the Fifth." It just makes it clear on the record that you're asserting your Fifth, you just say

I take the Fifth and we will understand that you are invoking your privilege under the Fifth Amendment not to self-incriminate.

A Okay.

Q From here on you're not compelled to answer any further questions if you believe that a truthful answer to the question might show that you have committed a crime or only if you wish to assert your privilege against self-incrimination. Accordingly, if you answer any questions, you will be doing so voluntarily. Do you understand that?

A Yes.

Q You should be aware that if you refuse to answer a question based on your Fifth Amendment privilege, a judge or jury may take an adverse inference against you in a civil action that the SEC may determine to bring against you. And I say "civil action," not criminal, civil. That means that a judge or jury would be permitted to infer that your answer to the questions might incriminate you. Do you understand that?

A Yes.

Q And that applies strictly to civil

proceedings.

MS. BEIDEL: Is there any -- based on the order, it appears as if there's no intention to bring any proceedings against Dr. Wang, period, as opposed to against Cassava. It seemed as if that advice here isn't applicable as to an adverse interest as to him, given the nature of your investigation.

MR. AMPARO: The United States, this is still in the fact-finding state. And certainly we're not in any position one way or the other to say whether any particular person or party will be a respondent in a civil proceeding. We're not at that stage at all. So we're not able to answer that.

But certainly if there would be a civil proceeding, let's assume there was one and it could possibly also involve Dr. Wang, it's hypothetical, then the notices I gave, that's where it would apply.

MS. HALL: And Counsel, to be crystal clear for the record, the formal order does not limit the Commission as to what parties we may pursue a civil enforcement

action against.

Is that clear to counsel?

MS. BEIDEL: It is. I suppose I was inferring more from the subject matter of the notice than from the parties listed in the notice. But based on the subject matters listed, there wouldn't be a grounds to pursue him individually, as he wasn't involved in the items that are listed in the order.

MS. HALL: Okay. To the extent that Dr. Wang is testifying under that assumption, I will say that the formal order would not limit us from bringing any civil action against any party based on the -- based on the matter under investigation here.

Does it make sense at this point to give you an opportunity to talk to your client, or should we continue?

MS. BEIDEL: Do you want to talk to me?

THE WITNESS: Yes.

MS. BEIDEL: Yes, please.

MR. AMPARO: Okay.

Off the record, it's 10:39.

THE VIDEOGRAPHER: Going off the

record. The time on the video monitor is 10:39 a.m.

(Discussion held off the record.)

(Recess taken from 10:39 a.m. to 10:48 a.m.)

THE VIDEOGRAPHER: We are back on the record. The time on the video monitor is 10:48 a.m.

BY MR. AMPARO:

MR. AMPARO: We're back on the record. It's 10:48 a.m.

MR. SPITZER: Before we go any further, we just read that script in which Ernie said that from now on you can say "I plead the Fifth." I just want to make sure that when you're saying that you are talking about reserving your right, privilege against self-incrimination under the Fifth Amendment. Is that correct?

THE WITNESS: Correct.

MS. HALL: And I'll just add if you intend to invoke any other privileges or protections, let's be specific about any of those going forward to the extent that would clarify the record. But we will understand

when you say "I'll take the Fifth" to be invoking your Fifth Amendment privilege against self-incrimination.

BY MR. AMPARO:

Q In the course of your career and subsequent to your Ph.D., did you do any research into biomarkers for the diagnosis of Alzheimer's disease?

A Yes.

Q And what are these biomarkers?

A These biomarkers -- after the Ph.D.?

Q Yes.

A These biomarkers include Tau and neurobranding. Neurofilament, neurofilament light chain, that's NFL. NFL. Neurofilament light chain. And all the inflammatory cytokines.

Q What are the inflammatory cytokines?

A IL-6, IL-1 beta, and the TNF alpha. And some other inflammatory include Trem-2. T-r-e-m 2. Trem-2. What other? Many others.

Q Okay. Of those that you mentioned -- just leaving it to that because there might be some more that you might recall later on -- for those you mentioned, when did you start

Q The software that comes with the machine, is it able to generate what is called a standard curve?
A DTX machine do not have that capability. We export into Excel file.
Q Okay. So this machine, it only outputs --
A Right.
Q -- the values that it got from each of the --
A Yes.
Q -- the light cell wells? These values, is it fair to say they call it optical density, is that what it's called?
A It's called optical density, yes.
Q This would be the case if you're using absorbents?
A Absorbents, yes.
Q Inside?
A Yes. It's a visual light color.
Q So the output would be just numbers, numbers that refer to the values that the machine ran for each value; right?
A Yes.
Q These values, you said they are

exported to an Excel --
A Excel file, yes.
Q Before getting exported to the Excel file, are there files created with the machine which would be the output of the reading?
A No. The reading would be -- would export -- once you get the plate, you're exposed, you can choose to expose -- export to Excel format. Otherwise, nobody can read it.
Q Okay. I guess the best way to try to explain it, let's go step -- step-by-step. We start with the step that you've done the initial phases of preparing a plate, incubating it, washing, and now it's ready to be read.
A Uh-huh.
Q So the plate is put into the machine?
A Yes.
Q And the machine reads the values of the plate?
A Take the Fifth.
Q And how is the output of the values, how is that recorded?
A I'll put -- the value would be in

Excel format, but it's -- it would be a pdf format that they would come with A-1, a number, A-2, a number. So you will have a position of the spot and the number right next to it.
Q So what you have is a set of values, numbers, corresponding to well designation?
A Correct.
Q Well A-1, well A-2?
A Yes.
Q B-1, B-2?
A Correct.
Q And aside from that information, are there any systems by which the plate reader keeps track of a particular work? For instance, would it assign it a serial number?
A It would assign a number, yes. You can obtain the number, the date of which program we use and the time of the read. And that's also the -- that would generate that number. And then obviously when they export to Excel file with the -- it will have that on the top of the Excel file as well. It will say DTX880 and the -- which program they read. And obviously the file would have the time,

the time stamp.
Q So there would be a time stamp that comes with the output?
A Yes, correct.
Q Okay. Let me see if I've got something that might help us, if I can show a document.
BY MR. SPITZER:
Q Could I just ask, you said before you export to Excel you wouldn't be able to read it. Is it in some sort of coding language or something before you export it? Is there something on the screen you would see?
A Screen would show dot dot, where the position is.
Q Uh-huh.
A It's in like a dot matrix and a very light color.
Q And is that -- that's created by the software that Beckman Coulter --
A Created by the software, yes.
Q Is there a way to save that as opposed to just export to Excel?

A I wouldn't be able to read them.
Q You as a human can't read it, but is there a computer file that's saved?
A Even you take a picture, you don't know what certain things are. You cannot take a picture. You cannot analyze it with the information.
Q Right. I understand. But does the software itself keep a copy, sort of a forensic copy of the optical densities that it's come up with?
A I don't know. Normally I assume, I assume that you have some coded things, but I also could -- but when you choose the format to come up with that, that will come with a string of the number, that's all. That's what we took.
Q Okay. So once the machine is done with the reading and there's a result, the only product you take from that is just the Excel output. You don't save anything else?
A I don't save anything else.
(SEC Exhibit Nos. 4 & 5 were marked for identification.)
BY MR. AMPARO:

Q For the record, I've asked the reporter to mark two documents, one marked as Exhibit Number 4. And this has the label below, it says 1SEC000318, page 1 of page 2. Page 1 would be one of the tabs of an Excel spreadsheet. And that Excel spreadsheet was produced to us by your counsel as 1SEC000318. That's what we got as the Bates number. So both Exhibit 4 and 5 come from the same Excel spreadsheets, but different tabs of the spreadsheet. Exhibit Number 5 would be the broad data tab. It has the -- well, I'll ask you to explain to us what those are. But Exhibit Number 4 has the two other tabs, one I think is called the general tab, and there's a methods info tab. Do you see that?
A Uh-huh.
Q Now, I'll ask you to look at Exhibit Number 4 first. The first page. Are you familiar with information in this format in an Excel spreadsheet?
A Prefix?
Q Pardon me?
A On the prefix. I take the Fifth.
Q You take the Fifth, okay. I'm

sorry. I understand that you are invoking your privilege under the Fifth Amendment to not incriminate yourself; is that right?
A Right.
MS. BEIDEL: Just for the record, the case law on the privilege is whatever it is. I assume we don't have to accept the characterization of it as not to incriminate himself. The case law is broader than that when you assert your Fifth Amendment right not to testify, and that's what he's doing.
BY MR. AMPARO:
Q With respect to Number 5, will you answer any questions concerning this exhibit?
A I take the Fifth.
Q Now, let me go back to Exhibit Number 4. And there is a date, measure date, evaluated date. Can you tell us what those dates refer to.
A Which date?
Q Well, one is one, two, three, the fourth line. It says "Date," and it shows 6/9/2020, 9:44. Now, there's another date, it says "Date measured." And it says 6/9/2020, 9:43. What does that information signify?

Q Is that samples that have been tested for a research purpose?
A Yes.
Q So aside from the phase 2-A and phase 2-B clinical trials of Cassava, your lab has not been engaged in any lab testing for any clinical trials. Is that fair to say?
A That's -- defined clinical trial, yes.
Q Now, with respect to your laboratory being used as a laboratory testing site for a clinical trial, in this case phase 2-A and phase 2-B of Cassava, are there any standards that it adheres to?
A Tech tips.
Q With respect to your lab being used for the -- uses a laboratory testing site for a clinical trial, does it have any system by which it documents its work it's received of samples, its storage of the samples and performance of assays of the samples?
MS. BEIDEL: Do you mean not to be specific to the phase 2-A and 2-B studies?
BY MR. AMPARO:
Q I would be specific with respect to

the laboratory being used as a clinical testing lab. And his answers, the only instances so far have been phase 2-A and phase 2-B of Cassava. What I'm seeking are the documentation and recommendation systems in the laboratory with respect to the lab work it does.

MS. BEIDEL: Don't answer that.

THE WITNESS: Take the Fifth.

BY MR. AMPARO:

Q Is there any system by which an assay, for instance, an ELISA assay, the processes by which the particular assay underwent, for instance, incubation for four hours or 12 hours, is there any system by which that is recorded to make sure that that was properly done?

MS. BEIDEL: Specific to the phase 2-A and 2-B?

MR. AMPARO: Yes.

THE WITNESS: Take the Fifth.

BY MR. AMPARO:

Q Now, with respect to just the general practice that you have with the lab -- and I'm not being specific to any phase 2-A or

A Yes.
Q I believe it's Japanese.
A Yes.
Q That is a standard. Do you compare the assays that you work with with Innotest?
A I did not compare to Innotest.
Q You did not?
A I did not.
Q You did not?
A Yes.
Q Now, another test that's fairly common again with CFS biomarkers is Euroimmun, which I understand is a unit of protein anolyte.
A Yes.
Q Do you compare your results with the assays that you used to go through with --
MS. BEIDEL: If your answer would be specific to the phases 2-A and 2-B, don't answer it.
THE WITNESS: That's only used in 2-A and 2-B, and I take the Fifth.
MR. AMPARO: Let's take a break. It's about noon. We're off the record. It's 11:59.

A Yes.
Q And there is an indication in one line that has a value R squared equals 0.9010. Do you see that?
A Yes.
Q And below that is a set of numbers.
A Yes.
Q On the left side it starts with zero, followed by blanks.
A Yes.
Q 22.625, 31.25, 62.25, 125, 250, 5,000, 1,000. Do you see those?
A Yes.
Q And do those refer to known sample concentrations?
A Take the Fifth.
Q Now, two columns to the right of those numbers that I just read starting with zero and 15.625, there are the numbers .145 followed by 2557, followed by 38065 -- that's .38065 -- followed by .7597, followed by 1.6095 followed by 2.1738 and followed by 3.27055. Do you see those numbers?
A Yes.
Q Are those the density ratings of the

known sample concentrations?
A Take the Fifth.
Q Now, the figures that I have just read to you, two columns of figures, are these values used to create a standard curve for the ELISA analyses?
A Take the Fifth.
Q Now, with respect to those values, did you create a standard curve, a so-called standard curve, to convert optical density readings to concentration?
A Take the Fifth.
Q In your research, did you create the curve that converts the optical density readings to the logarithm standard value of the concentration of the anolyte?
A Take the Fifth.
Q In creating your standard curve, did you use a program that's called the GraphPad?
A Take the Fifth.
Q Did you use a program that creates an output file with extension .pzf, that's P as in poppa, zebra, foxtrot, .pzf?
A Take the Fifth.
MR. AMPARO: Let me have this as the

A Yes.
Q And the graphs with points we understand are the coordinates of the points, 15.625 and .145 through 1.25. I'm sorry. Not that one but the log values. It's a graph of the log values of 15.625, 1.25 and so forth. The logarithm of these values, log base 10, and it's graphed against the optical density. We understand that those black dots represent those points, those, what I show called calibration points. Is that right, Dr. Wang?
A Take the Fifth.
Q And the line that's drawn to, drawn to the graph I understand is the result of a linear regression of the values of the one, two, three, four, five, six, seven points, and this linear regression line, straight line, is what you make as the standard curve for your assay for pT-181, Group 1; is that right?
A Take the Fifth.
Q Now, turning to the next page, second page of Exhibit Number 6, there's a series of numbers, the top being 1.468518, and it's right .5 -- .1512. And if you look at the set of numbers, the column, one, two,

they correlate to the dots on Exhibit 6, he cannot answer that.

Q I'm asking these questions. I'm just asking if you see the numbers, the red column and the numbers to the right of the red column.

A Right.

Q Do they correspond to the numbers showing on page 2 of Exhibit Number 6?

A Take the Fifth.

Q Then on the last page of Exhibit Number 6, there is the -- at the very top it says, "Best heat values." Do you see that?

A Yes.

Q And the term "slope?"

A Yes.

Q Below that there's a Y intercept and an X intercept.

A Yes.

Q And a value for the X intercept of 1.380. Do you see that?

A Yes.

Q And a slope of .58360?

A One -- divide you mean by slope, 0.5836? One overslope.

Q Yes, one overslope of .5836.
A Yes.
Q Do you see that?
A Yes.
Q Are those the parameters that define the line showing on first page of Exhibit Number 6?
A Take the Fifth.
Q Now, is that the line used to convert the values on the second page of Exhibit Number 6, the right-most values to the values to the left side of it?
A Take the Fifth.
MR. AMPARO: Now, for the record, we represent that we were provided what's Exhibit Number 6, 1SEC00195 to -198, the -198 is provided to us by counsel, and this is where that data came from the .pzf files.
I'll ask the reporter to mark the next exhibit, please.
(SEC Exhibit No. 7 was marked for identification.)
MR. AMPARO: It's number 7. I've asked the reporter to mark a set of pages as Exhibit Number 7. It's pages 1 through 4, and

spreadsheets for pTau-181, groups 1 through 5. So that's why there are five lines. And the red line is based on data from Thermo Fisher for their ELISA plate, KH00631.

BY MR. AMPARO:

Q Now, the second page, again, this is staff-generated, and it only shows one blue line, which is the blue line for Group 1 plate for pTau-181, Group 1 plate. Do you see that on top?

A Yes.

Q We understand that Group 1 plate data was provided to us as 1SEC000318. Now, the red line as specified before is the graph using data from Thermo Fisher. There's an additional line there which is in purple. Do you see the bottom?

A Yes.

Q And the purple line is a graph of all points, all of the known points that is the known samples of the plate, of five plates. Do you see where those sample lines fall with respect to the G-1 --

A Yes.

Q Is it fair to say that the data all

fall within the lower regions of the assay range of the plates' assay range?
A Take the Fifth.
Q The next page of page 3, it again shows the calibration points based on plate Group 1, 1SEC000318, and the calibration points are numbered one, two, three, four, five, six, seven. And it's noted there below point numbers one, two, three, four, five, six, seven are the values in pTau grams for milliliter and optical diameter, which is obtained from spreadsheet for Group 1, pTau-181. And the purple lines are the known points for Group 1 and known samples. Do you see the purple line?
A Yes.
Q If you look at the purple line l, again, it falls fairly low within the range of the assay as shown by points one, two, three, four, five, six, seven. Is that fair to say?
A Take the Fifth.
Q Now, do you see below with the purple line we have expanded it on page 4, you'll see the expansion that basically we've limited the X and Y scales?

A Yes.
Q So that the data now shown in red, the known samples data crosses a green line with the green line being the optical density of the lowest range of the assay. Do you see that?
A Yes.
Q And the blue lines again, those are the calibration points. And do you see that a large portion of the data points which are shown in red are below the green line?
A Take the Fifth.
Q Now, the values below the green line we understand are outside the assay range of the plates, so what whatever values obtained from -- for these may not be valid because they are outside the range. Is that fair to say?
A Take the Fifth.
Q For plate G-1 there are a total of 78 data points for known samples.
MS. BEIDEL: For what, for G-1?
MR. AMPARO: For Group 1, yes, G-1, there's 78 data points.
BY MR. AMPARO:

Q And these data points are -- for each sample there are three data points because they were done in triplicate. And they total 78. And of the 78 points, 55 are below the green line, which should be the lowest level of quantification, or saying it another way outside the range of the assay. Do you see that?
A Take the Fifth.
Q Is it fair to say, Dr. Wang, that a lot of the values that went into the calculation of sample values shown on Group 1 are outside of the assay range?
A Take the Fifth.
Q Is it also fair to say that your linear curve, which is shown by the line depicted by the data points in red, diverge from the curve that would have been created by the data points? I'm sorry. By the known sample data points.
A Take the Fifth.
BY MR. SPITZER:
Q Ernie mentioned the term "triplicate." What does "done in triplicate" mean?

A Take the Fifth.
Q And, again, all those marked in yellow will show in column H a value of less than .145 and will show a value in column F that is greater than 15.625. Do you see that?
A Yes.
Q If .145 corresponds to concentration of .5 -- a concentration of 15.625, should a concentration of less than .145 -- a reading of .145 -- I'm sorry. Let me start again. Should an OD reading of less than .145 provide a value that's less than 15.625?
A Take the Fifth.
Q Again, as you see, there's a lot of numbers in column H that were marked yellow. Pages 1, 2 and 3. And the total count of that is 55, and the total count of values starting from row 25 to row 101 is 78. So that the values that are below .145 is more than 70 percent of the total wells. Do you see that?
MS. BEIDEL: Wait. Are you asking him to do that math? He didn't count these. He didn't do the math.
MR. AMPARO: I understand. I

understand.

BY MR. AMPARO:

Q Now, this is something that Staff did and certainly --

MS. BEIDEL: If your question is does he see those figures on page 3, he can answer that.

Q Do you see those figures?

A Yes.

Q Okay. I will state for the record that it was the staff that did this. I counted all of the number of wells from row 25 through row 101. Then counted the wells that have been colored yellow because they fall below .145, and that's 55. Again, looking at these figures and looking at the known sample values, does it raise any concern to you that a lot of the concentration assigned to samples for pTau-181 may not be valid because they are outside the range of quantitation?

A Take the Fifth.

(SEC Exhibit No. 9 was marked for identification.)

MR. AMPARO: I asked the court reporter to mark a document, a one-page

whatever methodology you have. He doesn't know what it is. It's not fair to ask him to confirm that.
Q Do you see a difference in the value between column 1 and column 4?
A I see the value, yes.
Q Now, in the course of your ELISA analysis, did you do any backcalculations to check the validity of your standard curve?
A Take the Fifth.
Q I note that Exhibit Number 5, which is a full copy of the data in your Excel spreadsheet for pTau-82135, I do not see a number that would be what's called the CV or the CV value or the coefficient of radiation. Did you compute any coefficient of radiation in your ELISA work?
A Take the Fifth.
Q I also note on Group 1 looking at the samples, in this particular case the samples are starting with 03001-28 -- 00301, that's zero, I'm sorry, and 28 because there are pairs of samples, 28. All the wells are -- you stop except for the wells for the chromogen correction, the blank correction,

and one, two, three, four, five, six, and eight -- basically all the wells are used except for wells in ELISA plate columns 1 and 2 and ELISA plates row A and B of column 3. Everything else is used for unknown samples. Is that right?
A Take the Fifth.
Q Did you use any quality control samples in any of your ELISA analysis for phase 2-B?
A Take the Fifth.
Q Did you use any quality control samples in your ELISA analysis for phase 2-A?
A Take the Fifth.
BY MR. SPITZER:
Q What is chromogen blank specific to that? Not to this, very generally.
A Chromogen, it has no sample, no reagent, whatsoever. It's just empty crate, basically. The crate has no solution, nothing there. At the end you make the color and the chromogen brackets, you put the chromogen agent in. It's supposed to be background, nothing, but it would show some -- it still would detect some -- the camera would actual

detect some color. That's chromogen. Typically people don't pick it up.
Q How do you get chromogen blank values? Is that provided with the kit?
A No. The ELISA print when you read, it would show you that it's not a well even though you did not put anything in there.
Q I see.
BY MR. AMPARO:
Q Did you have any quality control procedures in carrying out your ELISA analyses for phase 2-A as well as phase 2-B?
A Take the Fifth.
BY MR. SPITZER:
Q Before we put this away, the third and fourth columns here, there are rows that say "percent change" in red. Do you see those?
A Yes.
Q Are those numbers that you calculated?
A Take the Fifth.
BY MR. AMPARO:
Q Going back to Exhibit Number 5, one -- near the third column shows 03001-0. Then

the next below that 03001-28. Do you see that?
A Yes.
Q Do those refer to the same subject or patient, 03001?
A Take the Fifth.
Q Now, the last designation, -0 and -28, do those refer to time points, the baseline, CSF as the 28-day CSF?
A Take the Fifth.
Q Now, did you arrange the samples in a certain manner so that you would know which one is zero day and which one is 28 days?
A Take the Fifth.
Q The samples as provided to you from the source, testing sites, were those samples marked aside from the patient code as zero day or 28-day samples?
A Take the Fifth.
MS. BEIDEL: I think that question assumes that he actually is the one that receives them, which is not correct.
THE WITNESS: I didn't.
MR. AMPARO: Okay.
THE WITNESS: I don't handle samples.

MR. AMPARO: Okay.
BY MR. AMPARO:
Q This pT1-821 tau Group 1, did you do the ELISA analysis shown by this spreadsheet?
A Take the Fifth.
Q Were you provided aliquots of samples with markings on the samples?
MS. BEIDEL: From whom?
Q Were you provided an aliquot sample by somebody working in your lab?
A Yes.
Q And these samples that were provided to you, did these have labels or information associated with the sample?
A No.
Q Did it have any information that identifies it by patient or subject I.D. number?
A No.
Q Did it have identification that identifies it as zero day or 28-day sample?
A No.
Q So none of the samples as you receive it have any designation of the patient I.D.; is that correct?

A No.
Q Who performed the actual analysis that's reflected in Exhibit Number 5?
A Take the Fifth.
Q Now, this ELISA analysis would entail putting samples into wells, would it not?
A Yes.
Q And each of the wells will be associated with a particular subject I.D., would it not?
A Take the Fifth.
Q Did you do the actual pipetting of samples in this particular case, samples of CSF into the ELISA wells to produce the values reflected in Exhibit Number 5?
A Take the Fifth.
Q There's a column of values as shown on Exhibit Number 5, the second column. Do you see that, it's all numbers, the second column of Exhibit Number 5?
A This?
Q Yes.
A Yes.
Q And to the left of it, starting from

well A.1, well A.2, so on?
A Yes.
Q Do you see that?
A Yes.
Q So that the value of well A.1, is that a value that's then transferred to I guess the matrix on top, the matrix with columns 1 to 12 and rows A to H. Do you see that?
A Take the Fifth.
Q We note that A.1 in column 1 has a column 2 value of .1242, and the matrix on top with a cell identified by A.1 also has a value of .1242. Do you see that?
A Yes.
Q And likewise, 12 A.1 -- A.2 has a value of .1037, and the matrix on top for A.2 has a value of .1037. Do you see that?
A Yes.
Q Were the values on the second column of Exhibit Number 1, were they transferred to that --
MS. BEIDEL: Hold on. He answered that. That question could have no purpose other than to compel him to answer when he's

already pled the Fifth about that.

MR. AMPARO: He can certainly plead the Fifth, but were those the numbers transferred to --

MS. BEIDEL: This is starting to get frustrating from my perspective. You're saying that you're not trying to compel him to testify over his Fifth assertion. He's asserted the Fifth. You went about it a different way, now you're asking the same question.

There could be absolutely no purpose for that other than for getting him to waive the assertion, and that's not appropriate and contrary to the instruction you have repeated on the record.

MR. AMPARO: We're not trying to. He can assert the Fifth.

MS. BEIDEL: If this is going to continue, I'm going to have him assert the Fifth to every question you ask instead of trying to help you. We're going to reset our course or else we're not doing this.

MS. HALL: Can I understand this is the concern from your perspective that the

question was asked and reasked?
MS. BEIDEL: The question was asked. There was a setup to go at the question a different way with the questions I allowed him to answer, and then the question was reasked. There's absolutely no purpose for that but to change the Fifth assertion.
MS. HALL: Let Ernie speak for himself, but there's no intention for us to seek answers that you do not intend to provide. So to the extent we're reasking questions, I can assure you that that's not the intention.
MS. BEIDEL: Okay.
BY MR. AMPARO:
Q Now, those numbers in column 2 of Exhibit Number 5, were those manually transferred to the matrix on top identified by -- separate from the numbers 1 to 12 in rows A to H?
A Take the Fifth.
Q If you look at the last page of column number 5, there's another matrix of numbers, which is marked "chromogen blank" subtracted and, again, has a matrix with

designations columns 1 to 12 and rows A to H. Do you see that?

A Yes.

Q Now, these values, as we understand it, are simply the values in the prior matrix minus the average of the values in A-3 and B-3. Are you able to confirm that?

A Take the Fifth.

Q The values on page 3 of Exhibit Number 5 appears to us to have been put into the value in the last column, the one, two, three, four, five, six, on the seventh column of pages 1 and 2 of Exhibit Number 5. Do you see that?

A Yes.

MS. BEIDEL: Does he see it or does it appear to have been put into the other chart? What's the question?

Q The numbers in the matrix, which is on page 3, were those numbers then transferred into one, two, three, four, five, six, seven, the seventh column of Exhibit Number 5?

THE WITNESS: Take the Fifth.

MS. BEIDEL: Can we go off the record?

MR. AMPARO: Off the record. It's 1:23.

THE VIDEOGRAPHER: Off the record. The time on the video monitor is 1:23 p.m.

(Discussion held off the record.)

THE VIDEOGRAPHER: Back on the record. The time on the video monitor is 1:34 p.m.

MR. AMPARO: Back on the record. It's 1:35 p.m.

BY MR. AMPARO:

Q I'm sorry if I created some confusion, so let me just try to clarify. Going back to Exhibit Number 5, there are values, numerical values in column 2, which appear associated to well values identified by the first column. Were these values placed into the matrix shown on top identified by columns 1 to 12 at rows A to H?

A Take the Fifth.

Q There's another matrix of values which is shown on page 3. And these values again are identified by column numbers 1 to 12 and rows A to H. Were the values in this matrix transferred to the seventh column, the

the pain. So you need to inject more many times. And that's how you get addicted. So the research objective, if I recall correctly, is to find out why opiate -- biological basis, why opiate would become so quickly tolerant. So we know that we can correct it, so we can adjust it so make it -- make the pain relief longer so that you won't be as addicted. But that was at least my research objective.

Q Were your research objectives the same as Dr. Burns and Pain Therapeutics, or did they have their own objective?

A Yes, of course.

Q The same ones?

A Yes.

Q Did this research lead to discoveries that brought about pTI-125?

A Cannot say.

MS. BEIDEL: That means he takes five.

Q Okay. We'll take that to mean if you cannot say that you -- we would prefer if you just say "I take the Fifth" so that the record is clear.

A Okay, I take the Fifth.

Q As we said before, it's certainly your right and privilege to assert the Fifth Amendment against self-incrimination, and we will not compel an answer to that. Likewise, we have to give notice that your refusal to answer questions based on your Fifth Amendment privilege, it may be used by a judge or jury to make adverse inferences against you in a civil action or -- there's no civil action -- if there ever would be such an action that might apply, a civil action of the SEC. Do you understand that there could be potential adverse inferences from your answers to take the Fifth?
A Yes.
Q Okay. Did this research involving the shared receptor, did this -- did this directly or indirectly result in the discovery of pTI-125?
A Take the Fifth.
Q In the course of your research in collaboration with Dr. Burns and Cassava or Pain Therapeutics, did there come a time that the company investigated a drug called pTI-125 as a possible therapeutic for Alzheimer's

disease?
A Take the Fifth.
Q With respect to what Cassava calls Simufilam, which we understand to be identical to pTI-125, is this a drug or substance that you discovered or was discovered through your research?
A Take the Fifth.
Q In the course of your association as a researcher of Cassava or pTI-125, did you engage in research to determine whether this substance or drug called pTI-125 or Simufilam had any effect on Alzheimer's patients?
A Take the Fifth.
Q Now, we'll state for the record that the company, Cassava, sponsored two clinical trials, one called phase 2-A and the other called phase 2-B trials. We understand there is an ongoing trial, a phase 3 trial, which we'll not get into. Did you have any involvement in the design or -- did you have any involvement in the design of the experiments behind phase 2-A and phase 2-B for pTI-125?
A Take the Fifth.

Q Did you have any involvement in the preparation of a document called clinical trial protocol for pTI-125?
A No.
Q Did you or your laboratory have any involvement in the phase 2-B clinical trial as a storage repository for clinical trial samples?
A Take the Fifth.
Q Did your lab have specific personnel assigned to receive clinical trial samples from clinical trial sites to document the receipt and the storage of shared samples?
A Take the Fifth.
Q Did your lab at CUNY, did it have storage facilities to keep samples from clinical trial sites in the phase 2-B trial of pTI-125, did it have the storage facilities to keep these samples frozen to affect the share of minus 18 degrees Celsius?
MS. BEIDEL: Are you asking did he have the ability to keep samples?
MR. AMPARO: I did not say that, the storage facilities. His lab.
MS. BEIDEL: Right.

BY MR. AMPARO:
Q A better way, did it have freezers to store the samples from the clinical trial in freezers that keep the temperature of minus 80 degrees Celsius?
MS. BEIDEL: You're tying it to the clinical trial, he can't answer that.
THE WITNESS: Take the Fifth.
MR. AMPARO: Okay. It certainly is permitted that we just have to ask that. We just have to ask him that.
BY MR. AMPARO:
Q Did your lab or your lab personnel, that personnel perform the process of aliquoting samples into separate storage test tubes?
A Take the Fifth.
Q Did your lab, either yourself or persons in the lab, introduce inhibitors to all of the aliquoted samples of CSF, inhibitors for, I guess, a protease inhibitor, a phosphatase inhibitor?
A Take the Fifth.
Q During the process of the phase 2-B trial, did there come a time that an outside

laboratory -- outside being a lab not associated with Cassava -- was assigned a task of assaying the biomarkers of AD on CSF samples collected from clinical trial subjects?

MS. BEIDEL: Do you mean aside from CUNY?

MR. AMPARO: Well, aside from Cassava, unassociated with Cassava.

MS. BEIDEL: Associated with him or unassociated with him.

MR. AMPARO: I just said not associated with Cassava.

MS. BEIDEL: Okay. I understand that. CUNY is technically an outside laboratory not associated with Cassava. I'm trying to ask you if you are calling for CUNY or are you calling for other outside laboratories.

MR. AMPARO: At this time I'm calling for any outside laboratory.

MS. BEIDEL: Okay, then he can't answer that.

THE WITNESS: Take the Fifth.

BY MR. AMPARO:

Q Okay. Was your laboratory involved in any of the processes of sending phase 2-B CSF and plasma samples to outside laboratories?
A Take the Fifth.
Q Was your lab involved in any receipt of unused samples returned to Cassava from outside testing laboratories?
A I don't know.
Q Did your laboratory have the facilities to keep track of temperature of storage freezers the times the freezers were open and the times that samples were removed from the freezer?
MS. BEIDEL: In connection with the phase 2-A and phase 2-B or in general?
MR. AMPARO: In general.
MS. BEIDEL: You can answer that.
THE WITNESS: Yes.
BY MR. AMPARO:
Q And what are these devices that record the temperature?
A The freezer itself had the temperature recorder.
Q Is that a continuous recording

device?
A Yes.
Q Is it kept in your lab?
A It's coming in in the freezer panel. You would be able to download the temperature.
Q And how long is the time period that it keeps such data?
A That I'm not sure.
Q Is there a practice of downloading and storing that information?
MS. BEIDEL: In what time period?
THE WITNESS: What time period?
BY MR. AMPARO:
Q Let's say during the time period 2018 until the present.
MS. BEIDEL: Can't answer that.
THE WITNESS: Okay, take the Fifth.
BY MR. AMPARO:
Q Prior to 2018, would you be able to answer?
A Don't -- we don't routinely, but the freezer would have warning if the temperature drops to a set point of more than 5 degrees. So that they would get the notice, they would

Q Did it previously have the software?
A The 4-PL Nemesis, it's more recently developed. We do a nemesis with the -- will provide -- at the moment it only have a later version of the GraphPad that has it.
Q When you say "the moment," what time frame are we talking about?
A It's after maybe 2022.
Q So prior to 2022, did your lab have access to a four-parameter logistics curve algorithm?
A No.
Q You did not have access to that?
A No.
Q So prior to 2022, what standard curve fit did your students use for their ELISA?
A We used the linear regression.
Q Do you use that even if the plate manufacturer prescribes or recommendation a 4-PL curve?
A Take the Fifth.
Q Have you ever had prior experience of generating a 4-PL or four parameter logistic curve for the ELISA assay at any

time?
A No.
Q During your entire course as a professor at CUNY with your own laboratory since 2014, prior to 2022, the only standard curve you've used for ELISA is a linear curve. Is that right, a linear curve?
A Take the Fifth.
Q Now, did your collaboration with Dr. Burns -- and I'm talking generally -- did this also involve discussing how experiments are carried out?
A In general terms?
Q I beg your pardon? In general terms, yes.
A We decide how the experiment -- what methods we may use in the experiment, yes.
Q And in the course of your collaboration, did she -- as a matter of course or practice, did she review your experimental results?
A Take the Fifth.
Q In the course of your collaboration with Dr. Burns, did she provide any feedback as to your experiments, for instance,

suggestions of how to improve or get better results?
A Take the Fifth.
Q Do you have any familiarity with an organization in the United States called Lund University in Sweden?
A No.
Q Did you have an opportunity, get an opportunity to review the results of assays at Lund University on behalf of Cassava?
A No.
Q Are you able to tell us as to how Cassava or management or officers at Cassava came about to task you with the -- with the redo of CSF biomarkers assays at Lund University?
A I did not know what you mean.
Q Okay. Let me try to restate that. Did Cassava after May, May of 2020, ask you to perform assays of CSF samples obtain interface to the clinical trial?
A Take the Fifth.
Q Did you -- I take that back. Earlier I had asked you generally how you came about to choose certain ELISA plates for your

work. Are you familiar with the company Thermo Fisher that produced Invitrogen, rendered Invitrogen ELISA kits?
A Yes.
Q Have you used Thermo Fisher Eritrogen ELISA kits products?
A Generally, yes.
Q Have you used this product Thermo Fisher Invitrogen ELISA kits for work not involving Cassava?
MS. BEIDEL: You can't answer that.
THE WITNESS: Take the Fifth.
BY MR. AMPARO:
Q Have you used ELISA kits in projects not involving Cassava produced by Life Span?
A Yes.
Q What products are these?
A Not include Cassava?
Q Not involving Cassava.
A I don't remember. It is several occasions, but I don't remember.
Q Have you done ELISA assays for Neurogranin in not involving Cassava or for Cassava?
A No.

Q In papers that -- did you have a collaboration with Dr. Burns in scientific articles subsequent to the phase 2-B test results?
A I take the Fifth.
Q Okay. Did you have a collaboration with Dr. Burns with respect to a manuscript that was sent to major communications which then discusses the phase 2-B test results?
A Take the Fifth.
Q Did you have communications with Dr. Burns regarding your view that the data from Lund was in her opinion invalid?
A No.
(Discussion held off the record.)
BY MR. SPITZER:
Q Dr. Wang, let me ask you a few follow-up questions. Did you perform radio-ligand assays to determine the binding affinity between Simufilam and Filamen A?
A Take the Fifth.
Q Are your -- let me strike that. The agreements between the research foundation and Cassava that you and your colleagues have ventured into, do those provide for an annual

Q Switching gears a little bit, we talked earlier about Western Blotting. I understand at a very, very low level that you run samples through a gel and then you take the gel and you turn it into some sort of image; is that right?
A Well, you have to transfer that to the membranes, and then you apply the antibodies and similar to ELISA. ELISA sit on the crate. They would apply to the membranes and they would detect a molecule.
Q At some point you have to be able to visualize that?
A You can visualize that more by most of the people using imaging device, a camera. And -- or all we can petition away, you can expose to film.
Q X-ray films?
A Yes. Because it's a fluorescent, so you will see it.
BY MR. AMPARO:
Q Is the first part of Western Blotting, correct me if I'm wrong, does that involve electro --
A Electrophoresis, yes.

Q To separate the proteins in accordance to the molecular weight?
A Two types. You can separate by molecule weight. And you can also separate by charge.
Q Now, the charge, is that what you call isoelectric?
A That's what they call it.
Q And both of them create blots?
A It can. It can potentially create blots, yes.
Q When you're differentiating proteins by molecular weight, you allow for electrophoresis to move the proteins into bands according to the electroweight?
A Correct.
Q After that what do you do to protect the bands?
A Using antibodies.
Q And after you use antibodies, do you put any chemicals in to make the bands appear?
A Yes. Typically you can put the two different -- two antibodies, one called primary. Primary is the antibody detect the protein of interest. And that antibody you

can put a second antibody which caps the primary antibody, and that second, secondary antibody would have the -- in this case it will actually have an enzymes. And the enzyme would, when you put the chemical reagent in, the enzyme will cut, would exhibit the florescence.
Q So you start with electrophoresis. And then you transfer that to a membrane?
A Correct.
Q And the membrane, is that where you apply the antibodies to the --
A Correct.
Q -- the antibodies to visualize the --
A Well, the antibody would tack on the target, and then you put the secondary antibody. The secondary antibody would have an enzyme, which can release the florescence.
Q So the end result of the blot, this isn't a membrane; right?
A Yes.
Q And how do you preserve that blot?
MS. BEIDEL: Stop here.

THE WITNESS: That's it? Okay.
BY MR. SPITZER:
Q Are you taking the Fifth here?
A Yes.
Q We just need to you verbalize it in response to the question. Following along the same lines -- and I understand that your attorney may object -- what do you do to capture the image of the membrane as a general matter?
A Fifth.
Q Are you the person who actually performs that imaging in your lab?
A Take the Fifth.
Q Is there anyone else in your lab that does that imaging?
A Take the Fifth.
Q And then after the imaging, are those images then loaded into some sort of photo software or Adobe or some sort of software that can create an image?
A Create an image? No. Take Fifth.
MR. AMPARO: As a general question, how do you quantify the blots?
THE WITNESS: Take the Fifth.

BY MR. SPITZER:
Q Switching topics again, I apologize, just some follow-up questions that I have. Are you generally familiar with ranges of human AD biomarkers as part of your regular practice?
A Yes.
Q And how are you familiar with that?
A How I'm familiar with that? By reading the literatures.
Q Reading the literature. Did you as part of the 2-A and 2-B testing using ELISAs, did you do any comparison of the results to what the literature showed in terms of normal ranges for AD patients?
A Take the Fifth.
Q Do you know whether the results of the 2-A and 2-B tests were, in fact, in line with the ranges of AD patients?
A Take the Fifth.
BY MR. AMPARO:
Q The same set of questions as my colleague, but it applies to total tau. Did you prepare this with what other researchers got in terms of absolute values?

THE WITNESS: That's it? Okay.
BY MR. SPITZER:
Q Are you taking the Fifth here?
A Yes.
Q We just need to you verbalize it in response to the question. Following along the same lines -- and I understand that your attorney may object -- what do you do to capture the image of the membrane as a general matter?
A Fifth.
Q Are you the person who actually performs that imaging in your lab?
A Take the Fifth.
Q Is there anyone else in your lab that does that imaging?
A Take the Fifth.
Q And then after the imaging, are those images then loaded into some sort of photo software or Adobe or some sort of software that can create an image?
A Create an image? No. Take Fifth.
MR. AMPARO: As a general question, how do you quantify the blots?
THE WITNESS: Take the Fifth.

BY MR. SPITZER:
Q Switching topics again, I apologize, just some follow-up questions that I have. Are you generally familiar with ranges of human AD biomarkers as part of your regular practice?
A Yes.
Q And how are you familiar with that?
A How I'm familiar with that? By reading the literatures.
Q Reading the literature. Did you as part of the 2-A and 2-B testing using ELISAs, did you do any comparison of the results to what the literature showed in terms of normal ranges for AD patients?
A Take the Fifth.
Q Do you know whether the results of the 2-A and 2-B tests were, in fact, in line with the ranges of AD patients?
A Take the Fifth.
BY MR. AMPARO:
Q The same set of questions as my colleague, but it applies to total tau. Did you prepare this with what other researchers got in terms of absolute values?

A Take the Fifth.
Q With respect to pTau-181, did you check the literature to see whether your values fall within the range of what other researchers got for say normal, mildly linear strictly cognitive impairment or called AD?
A Fifth.
Q With respect to the interleukin 6, did you check whether your absolute values are in line with the absolute values of other researchers?
A Take the Fifth.
Q Do you have any intellectual property rights for the substance called pTI-125 or Simufilam?
A Only in the patent, but the intellectual right rests on -- with Cassava.
Q When you say "the patent," are you the inventor?
A Inventor, but the intellectual rights, it belongs to Cassava.
Q Did you make assignment of your rights to Cassava?
A Assignment, I just know I'm the inventor.

Q So the subjects seem to stand out from the rest of the other subjects, which are on the positive side. Do you see that?

MS. BEIDEL: Does he see that they stand out? Is that your question?

MR. AMPARO: They seem to be different in that they are on opposite sides of the zero line.

MS. BEIDEL: Don't answer.

THE WITNESS: Take the Fifth.

BY MR. AMPARO:

Q I'll also note for the record that there are two red dots, and those two red dots are the subjects that are highlighted in yellow. Is there any explanation as to why this specific groups of people are showing in a scatterplot to be separate from the other groups that are about the zero line?

A Take the Fifth.

Q If you go to page 2, which is a scatterplot of total tau, on the patient I.D. do you see the same patients that were marked red, previously also marked red, -06004, -07003, all the way down to -13025. There are eight of them. Do you see those red patient

I.D.s?
A Yes.
Q I'll represent for the record that once again those red patient I.D.s are the ones that are opposite side of the zero line from the other subjects. In this case the positive, that means the level of t-tau increases in the 28 days for this placebo group. And it's encircled in green. Do you see those dots encircled in green?
A Yes.
Q Do you have any explanation as to why these groups are separate from the other dots?
A Take the Fifth.
Q When you do a random assignment, would it be the expectation that the spread of the subjects would be fairly random?
A Suppose so, yes.
Q I'll note for the record that it's the same group of patients that are opposite side of the bulk of the subjects in the placebo group. If you go to the next page, page 3, this is a scatterplot for pTau-181 assay. And this particular plot was based on

source data 1SEC309312, -315, -318 and -322. Again, on the left side you see eight subjects marked red. It's the same eight subjects marked red in the first two pages. And those red subjects are the dots that appear above the red line of a scatterplot encircled in green. Do you see that?

A Yes.

MS. BEIDEL: He sees the dots is the question.

Q Do you have any understanding or explanation as to why this particular group of placebo group of patients, the same ones, appear on opposite sides of the zero line of 28 days from the rest?

A No.

Q On page 4, it's the same thing. It's a scatterplot for neurofilament life, which is abbreviated as NFL. And, again, this is all placebo group. You have eight patient I.D.s marked in red. And all of those appear to be on opposite sides of the zero line in the scatterplot appearing to be separate from the rest. Do you have any reason as to why this group of patients appear on the

scatterplot opposite from all of the other patients?

A The Fifth.

MS. BEIDEL: My apologies. I would have said this off the record, but I thought we were almost wrapped up. Dr. Wang has a train to catch. Is there any way to speed this up by saying he'll give consistent answers to all of these pages with respect to all of these groups of circled dots?

Q If you look at the next page, page 5, again do you have an explanation or reason as to why --

A Take the Fifth.

Q You take the Fifth again. When I say "as to why," there's a certain groups of people that are separate from the rest in the scatterplot. Again, on page 5 it's for YKL 40 assay. Again, the same groups of patients marked red in the scatterplot appears separate from the rest of the group. That is on opposite side of the zero line. Do you see that? Do you have an explanation as to why these particular patients appear on the separate side on the scatterplot?

A Take the Fifth.
Q And page 7 is a scatterplot for interleukin 6 IL-6. And, again, you have 6 patient I.D.s marked in red, and these red patient I.D.s have scatterplot dot points that are above the zero line opposite from all the rest. Do you have an explanation as to why this eight patient I.D.s appear on a separate side of zero line for the rest?
A Take the Fifth.
Q Again, page 6 -- I mean, page 8 is a scatterplot for Trem 2. And, again, you have the six -- I mean, you have the eight patient I.D.s marked in red, and they correspond to dots that are on the positive side of the zero line of the scatterplot, again, opposite from all of the other subjects. Do you have an explanation as to why these patients have appeared consistently so far opposite most of the other patients in the group?
A Take the Fifth.
Q Finally, we have scatterplot for HMGB1, and again it's the same story with the same eight patient I.D.s where there are plots showing positive whereas everyone else in the

group shows negative. Negative changes. Whereas this eight patient I.D.s of positive changes were HMGB1. Do you have any explanation as to why this is the case?

A Take the Fifth.

Q You've seen -- let me hand you one final -- two sets of exhibits. Can you mark each subsequently.

(SEC Exhibit Nos. 11 & 12 were marked for identification.)

(Discussion held off the record.)

BY MR. AMPARO:

Q Dr. Wang, you have before you what's been marked as Exhibit Number 11 and 12, and respectively they are scatterplots for ELISA assays for one, IL-1 beta and TNF alpha. Did you perform assays for Cassava for the biomarker IL-1 beta and TNF alpha?

A Take the Fifth.

Q We note that these two assays, we've plotted the same patient I.D.s as the prior exhibit, Exhibit Number 10. And those eight patients, their plots are in red, and they are all over the place. Some positive and some negative.

Do you see that?
A Yes.
Q That would be the case also with 12, with some positive, although mostly negative along with the rest of the group.
Now, since you're not answering whether you performed this assay or not, I gather that you won't be answering as to whether there's any explanation as to how these particular patients are distributed in scatterplot?
A Take the Fifth.
Q These two assays, TNF alpha and IL-1 beta, did you perform this before May of 2020?
A Take the Fifth.
Q For these two particular assays, IL-1 beta and TNF alpha, were these biomarkers not retested as opposed to the other ones that were retested after getting results from Lund?
A Take the Fifth.
MR. AMPARO: Dr. Wang, we have no further questions at this time. And if we do have additional questions to ask, we'll let your counsel know.
THE WITNESS: Okay.

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of: )
) File No. HO-14346-A
CASSAVA SCIENCES )

WITNESS: Hoau-Yan Wang
PAGES: 197 Through 307
PLACE: Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
DATE: Wednesday, March 20th, 2024

The above entitled matter came on for hearing, pursuant to notice, at 10:05 a.m.

prefix also from DOJ?

MR. AMPARO: Cass is production of Cassava.

MR. BEIDEL: Okay.

BY MR. AMPARO:

Q Now, we?ve tried to match production from two sources. If you look at the first page of Exhibit 364, this came from DOJ and the second page came from Cassava, but they have the same markings on top. CSF ALB. Do you see that, CSF ALB?

A Yes.

Q And they also have the numberings one, two, three, four, five, six, seven, eight. Do you see that?

A Yes.

Q The numbers seem to match. Are these two images related? Page one and page two of Exhibit 364?

A Take the fifth. I take the fifth.

Q Okay.

Now, going to the next two pages, that?s page three and page four. Are pages three and four related? Witness, this is looking at you.

A Take the fifth.
Q Okay.
MR. SPITZER: Can we just clarify for the record? you?re invoking your right under the fifth amendment of the constitution. Is that correct?
THE WITNESS: Correct.
MR. SPITZER: Okay. So when you say take fifth going forward, that?s what we?re understanding you to mean, just so the record support.
MR. BEIDEL: Thank you.
MR. AMPARO: Will you be taking the fifth on any further questions I might have regarding Exhibit 364?
THE WITNESS: Yes.
MR. BEIDEL: To the extent it helps, Counsel, it?s the same invocation as the last time. He?s not going to be discussing the substance of any of his western blotting techniques because we understand that to be the subject of an ongoing DOJ.
MR. AMPARO: Okay, no problem.
Let?s go off the record. It?s