IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| vs. | ) Criminal Case No. 8:24-cr-00211-TDC-1 |
| HOAU-YAN WANG, | ) |
| Defendant. | ) |

TRANSCRIPT OF JURY TRIAL
EXCERPT - PRETRIAL ARGUMENTS
BEFORE THE HONORABLE THEODORE D. CHUANG
UNITED STATES DISTRICT COURT JUDGE
MONDAY, OCTOBER 20, 2025, AT 8:30 A.M.

APPEARANCES:

On Behalf of the Plaintiff:

BY: ANDREW TYLER, ESQUIRE
KASHAN PATHAN, ESQUIRE
OFFICE OF THE UNITED STATES ATTORNEY
1400 New York Avenue NW
Washington, DC 20005
(202)514-8804

On Behalf of the Defendant:

BY: JENNIFER L. BEIDEL, ESQUIRE
EMMA BLACKWOOD, ESQUIRE
MARK CHUTKOW, ESQUIRE
DYKEMA GOSSETT, PLLC
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48304
(215)470-0667

ALSO PRESENT: Hoau-Yan Wang, Defendant
Anna Cornish, Paralegal

***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPED NOTES***

P R O C E E D I N G S

(Court called to order.)

**DEPUTY CLERK:** All rise. The United States District Court for the District of Maryland is now in session. The Honorable Theodore D. Chuang presiding.

**THE COURT:** Thank you, everyone. Please be seated.

**DEPUTY CLERK:** The matter now pending before this court is Criminal Action Number 24-0211-TDC, United States of America v. Hoau-Yan Wang. We are here today for the purpose of a jury trial.

Counsel, please identify yourselves for the record.

**MR. TYLER:** Good morning, Your Honor. Andrew Tyler on behalf of the United States. And I have here at counsel table our paralegal Anna Cornish and FBI Special Agent Jeffrey Weeks. And I'll let my colleague introduce himself.

**MR. PATHAN:** Good morning, Your Honor. Kashan Pathan on behalf of the United States.

**THE COURT:** Okay. And just -- every room is a little bit different. The acoustics aren't that great here. Just make sure you pull the microphones up and speak into them.

For the defense?

**MS. BEIDEL:** Good morning, Your Honor. Jennifer Beidel for Dr. Hoau-Yan Wang.

**MR. CHUTKOW:** Good morning, Your Honor. Mark Chutkow.

**MS. BLACKWOOD:** Good morning, Your Honor. Emma Blackwood.

**THE COURT:** Good morning.

And good morning, Dr. Wang.

So we're here for the first day of trial. There's a number of issues, I understand, that have arisen overnight. Now, there's this issue about a continuance, and I do want to get to that; but I also think it's important to resolve the motion on the *Brady* issue.

So I'd like to -- usually a jury is not ready until about 9:15, 9:30, but I'd like to address that first since I think that has impacts on everything, including the request to continue based on illness.

So I appreciate everything that was submitted in the -- in response to the *Brady* ruling. Just to recap, on October 7th, 2025, the government disclosed to the defense a May 30th, 2025, letter from Lynda Mules of the City University of New York to Dr. Thomas Baird of the US Department of Health and Human Services Office of Research Integrity, or ORI.

This CUNY letter, as I'll refer to it, states that CUNY's final conclusion -- or it identifies their final conclusions relating to the investigation into Dr. Wang's alleged research misconduct.

According to the letter, CUNY based its conclusions on the findings of the May 26, 2023, final investigation report and

final report addendum, which I'll refer to as the final report, that was issued by CUNY's research misconduct investigation committee.

CUNY stated that the committee in its final report "Did not find that Dr. Wang's actions constituted acts of intentional, knowing, or reckless falsification and/or fabrication" and therefore "concluded that Dr. Wang had not engaged in research misconduct as defined by CUNY's policy."

As to the allegations against Dr. Wang, based on the committee's conclusions in its final report, CUNY determined that "research misconduct did not occur."

CUNY cautioned that the committee, not finding that Dr. Wang committed research misconduct was required -- may have erroneously believed that definitive evidentiary proof of fabrication/falsification was required for a finding of research misconduct.

Nevertheless, CUNY found that the committee had acted in good faith and so chose not to disturb or reevaluate those findings now.

The CUNY letter had also stated that the committee had found that "certain images were suspicious and highly suggestive of deliberate scientific misconduct."

The underlying final report containing that statement and other conclusions highly critical of Dr. Wang was publicly leaked in October of 2023 and was previously produced to

defense prior to now, that is, I believe in or about 2024.

As at the pretrial conference last week on October 16th, the Court found that this CUNY letter, which is Exhibit 1 to the defendant's motion, is *Brady* material in that it contains certain information favorable to the defense, the Court ordered the government to submit all of its communications since January 1st, 2025, with ORI, CUNY, and the National Institutes of Health for in camera review.

It also ordered the government to review all of the materials in its possession in this case to identify any *Brady* material consisting of any material favorable to the defendant and to certify that it either had disclosed all that material or had no additional material in its possession and control.

I believe the government has now provided that certification that there's no remaining undisclosed *Brady* material. And the Court has completed its in camera review of the communications, and I'm prepared to rule on the motion as it stands now.

So under *Strickler v. Greene*, 527 US 263 (1999), the defendant's due process rights under *Brady* and its progeny are violated when the evidence at issue is favorable to the defendant. The evidence was suppressed by the government, whether willfully or inadvertently, and prejudice ensued.

Where the Court has found that the CUNY letter contains at least some information favorable to Dr. Wang, it must address

whether there was either willful or inadvertent suppression.

Based on the government's representations at the pretrial conference and the Court's in camera review of the correspondence between the prosecutors, who I'll refer to as DOJ, ORI, and CUNY, the Court finds that the prosecutors, meaning trial counsel sitting here in the courtroom, did not have actual knowledge or possession of the CUNY letter until October 3, 2025, when they received it from CUNY, where they disclosed it to defense on October 7th, which was two business days later, there was no willful failure to disclose.

As for an inadvertent failure, the record shows that the CUNY letter was sent to Dr. Baird of ORI on May 30th, 2025, and at that time Dr. Baird was working with the prosecutors in relation to their potential presentation of expert testimony through Dr. Brookes.

In *Kyles v. Whitley*, 514 US 419 (1995), the Supreme Court stated that the prosecutor has a duty to learn of any favorable evidence known to others -- the others acting on the government's behalf in the case, including the police.

At the same time, under *United States v. Taylor*, 942 F.3d 205, Fourth Circuit (2019), the prosecutor does not have a duty to learn of any favorable evidence known to any government agent, and the court emphasized that the prosecutors are generally responsible only when the other agents were working on the same case.

Under *United States v. Robinson*, 627 F.3d 941, Fourth Circuit (2010), there are "no hard-and-fast rules" on the issue of which government agents count as part of the prosecution team for this purpose.

Now, here, CUNY's internal investigation of Dr. Wang was generally separate from the DOJ criminal investigation. ORI, a federal agency, had an oversight rule over CUNY's internal investigation in that it was monitoring it and, upon its conclusion, would reach determinations on whether it sufficiently addressed the problem.

Thus, at most, ORI was loosely involved in something akin to a parallel civil investigation.

The existence of the parallel civil investigation does not itself render DOJ responsible for the information obtained through it or the CUNY letter. In cases such as *US v. Gupta*, 848 F.Supp.2d 941, Southern District of New York (2012), and *United States v. Bases*, 549 F.Supp.3d 822, Northern District of Illinois (2021), courts have found that prosecutors have a *Brady* obligation to search for and disclose exculpatory information in the possession of a regulatory agency conducting a parallel civil investigation into the same subject, but that obligation typically arises when there was joint fact-gathering, as in *Gupta*, through activities like joint interviews of witnesses or ongoing coordination of investigative activities, as occurred in *Bases*.

8

That was not the case here. In 2023, there was some communication between ORI and DOJ about a subpoena in a private civil case against Cassava that was broad enough to arguably encompass the DOJ investigation, but that limited exchange did not demonstrate joint investigative activity.

Also in 2023, DOJ asked ORI for examples of its own prior western blot image analyses that were unrelated to Dr. Wang, and also to do a review of Dr. Brookes's work. And they shared some of his work with experts named Dr. Runko and Dr. Du. But there does not appear to have been any further interactions about this case until late February of 2025, two years later.

So the level of coordination of investigations or litigation was not at the level providing a general basis to impute knowledge of ORI to DOJ up to that point.

However, in February, March, and April of 2025, DOJ reached out to ORI counsel again to ask for an expert who could review Dr. Brookes's expert reports for the purpose of assessing his approach.

Dr. Baird and another scientist were designated to assist. There appears to have been a meeting in April about this issue, and the records show that, since late July 2025, Dr. Baird has also reviewed, at DOJ's request, the defense expert witnesses' reports and assisted DOJ in preparing language for its *Daubert* motion.

He also attended the *Daubert* hearing at DOJ's request so

that he could potentially provide advice based on the direct and cross-examination.

The record also shows that in or about -- at or -- perhaps at that April 2025 meeting, some of the images that Dr. Brookes was using for his expert testimony, including some of the ones perhaps that we are calling the raw images, were provided -- were brought to a meeting with ORI.

So all these activities were not in support of any ORI mission but of DOJ's prosecution of Dr. Wang.

Where these activities went beyond just consulting on science generally to assisting with the actual prosecution of the case, including advising on the *Daubert* hearing, Dr. Baird can fairly be deemed to be part of the prosecution team from April 2025 forward in that he was acting on the government's behalf in the case, as the term is described in *Kyles*.

Although the government argues that Dr. Baird and ORI were not involved in their investigative, prosecutorial, or strategic decisions, it's not required that an officer or agent be in the inner circle of a case to be working on the same case for purposes of imputing their knowledge to the prosecution.

While Dr. Baird received the CUNY letter while he was part of the prosecution team, it's also correct that he did not receive that report as part of his role with the DOJ team.

There was no point at which anyone suggested to Dr. Baird that, because he was working with DOJ in relation to the expert

testimony, he should identify and bring forward evidence from the CUNY investigation to assist with the DOJ investigation.

Nevertheless, what -- we are talking about the exact same person who, in the same time frame, received the CUNY letter and was also assisting DOJ with its prosecution. And the CUNY letter relates to a key question in this case: Whether the review -- a review of Dr. Wang's materials does or does not establish fraudulent alterations.

The Court concludes that DOJ had constructive knowledge of the CUNY letter through Dr. Baird and that it therefore should have disclosed it in May of 2025 but inadvertently failed to do so.

As for the issue of prejudice, the Court agrees with the defense that there was at least potential prejudice to Dr. Wang in that he could not, in the months between May and October of 2025, investigate the bases for CUNY's decision, including by seeking to interview witnesses associated with the CUNY letter, to determine if there is favorable witness testimony or evidence that could be presented at trial arising from the letter.

At this point, we do not know whether such favorable evidence can be identified and presented.

The Court notes, though, that the potential prejudice from this lost time is tempered by two facts.

First, where the CUNY letter states the committee's final

report is being adopted and where Dr. Wang's defense counsel already had that report, any prejudice is limited to the inability to present evidence about CUNY's decision to characterize the report in the way it did in the letter, not anything about the underlying analysis which was already disclosed.

Second, the prejudice is limited in that the CUNY letter and the underlying final report are highly critical of Dr. Wang's actions and continue to show that there was a strong basis to believe that Dr. Wang engaged in fabrication. Arguably, only his failure to produce original data prevented the committee from concluding that he had committed research misconduct. So any use of the favorable parts of the CUNY letter would present certain risks and potentially backfire on the defense.

Still, where the CUNY letter was *Brady* material, the government was obligated to produce it earlier, and there was at least potential prejudice to Dr. Wang, the Court must consider an appropriate remedy for this failure.

Although the defense has asked for a dismissal, that remedy is not warranted here. In *United States v. Struckman*, 611 F.3d 560, Ninth Circuit (2010), the case relied upon by the defense, the court stated that dismissal is an appropriate remedy where there is prejudice and prosecutorial misconduct is flagrant.

Here, the government has not engaged in bad faith, let alone flagrant misconduct. There is no evidence that the government deliberately withheld this information. The failure to disclose appears to be the result of a general conclusion that ORI was not part of the prosecution team, which appeared to have been correct throughout most of the case, and a failure to consider whether Dr. Baird had become part of the prosecution team.

It is also a close question whether, where Dr. Baird received this report in a different capacity from his role with the DOJ prosecution, his knowledge of it could actually be deemed to be something that DOJ would have expected to know about.

And, in any event, there's no basis to conclude that anyone made an affirmative decision not to bring the CUNY letter forward.

The defense alternatively asked for the Court to exclude the testimony of Dr. Brookes, but the Court also finds that to be an inappropriate remedy.

The Court does not find that Dr. Wang was prejudiced by his inability to use the CUNY letter at the *Daubert* hearing.

The extent of Dr. Brookes's knowledge of the CUNY investigation, which is the line of questioning referenced by the defense, is not directly probative on the issues of relevance and reliability of Dr. Brookes's analysis.

And where the Court has already imposed significant limitations on Dr. Brookes's testimony even without having had access to the CUNY letter, it finds that the contents of the letter, even if known earlier, do not provide a basis to impose any additional restrictions.

To the extent that the CUNY letter could be used to undermine Dr. Brookes's conclusions, the defense will be able to use it during Dr. Brookes's testimony at trial.

The Court instead finds that the most appropriate remedy and the standard remedy in this type of situation is a continuance if the defense chooses to exercise that -- to -- to ask for one.

Under *United States v. Smith Grading and Paving*, 760 F.2d 527, Fourth Circuit (1985), when *Brady* material is disclosed late, no due process violation occurs as long as *Brady* material is disclosed to the defendant in time for its effective use at trial.

Under *United States v. Cabrera-Rivas*, 142 F.4th 199, Fourth Circuit (2025), a disclosure right before or even during trial does not violate *Brady* so long as the loss of time -- so long as the defendant can still make effective use of the material.

Where the prejudice here is the loss of time to determine whether the contents of the CUNY letter can be used in some way, including finding witnesses who could testify on the

issue, the appropriate remedy is more time.

Here, where the defense has already subpoenaed witnesses and documents relating to this issue and the trial is scheduled to last up to four weeks, it is possible that the defense will be in a position to present any evidence arising from the CUNY letter during the trial.

Nevertheless, where that is not fully known at this time, the Court has already offered the defense a continuance and continues to do so.

The Court finds that the remedy of the offer of a continuance rather than dismissal or some other more severe sanction is also appropriate because, as already discussed, the CUNY letter, while favorable in one sense, contains information, particularly when combined with the final report, that is otherwise quite unfavorable to Dr. Wang. So it is by no means clear that it will prove to be favorable in an overall sense to Dr. Wang.

So for those reasons, the motion to dismiss for prosecutorial misconduct, ECF 118, is denied in that the Court will not dismiss the case or strike the testimony of Dr. Brookes. The Court has offered and continues to offer a continuance as a remedy.

So I did want to ask the parties at this point, I know there's multiple issues here, but I think, Ms. Beidel, on Friday or Thursday, you said that you weren't inclined for a

lengthy continuance under these circumstances, but obviously we had to wait to see where we were overall.

Do you have a different position on that? I know there was discussion about a potential agreement of sorts. Anything else you want to offer on this *Brady* issue?

**MS. BEIDEL:** Our position with respect to a lengthy continuance remains the same, Your Honor. There is also a -- I don't know if this is the time to segue into the separate request for a continuance based on the hospitalization of one of the prosecutors.

But perhaps that shorter -- the shorter continuance necessitated by that hospitalization could serve dual purposes here.

**THE COURT:** Okay. So I -- yeah, I just want to -- they're related but they're also separate. Just -- I want to kind of -- maybe I should have asked this at the outset.

I take it from the silence, since we got a lot of communications from the parties, there was no sort of -- there had been some discussions about a meeting of the minds on some sort of resolution.

My assumption was that didn't happen, and so we were still where we were. Is that correct?

**MS. BEIDEL:** That's correct.

**THE COURT:** Okay. And so, as I've said, I think my ruling is, while there was something that should have been

disclosed, the appropriate remedy would be a continuance. I understand that you are not interested, for a variety of reasons, in a lengthy continuance.

I don't know if between Friday and today -- or Thursday and today, you have a better sense of -- just on this issue, if you hadn't -- if there were no other issues involved, whether there's a certain amount of time you would ask for or not.

**MS. BEIDEL:** Both parties did initiate conversations with CUNY about these materials. So we -- I can say we've engaged with CUNY. They seem like they will be responsive relatively quickly in terms of getting the materials. We don't physically have the Rule 17 subpoenas yet because they were sealed when they were filed. But I think we're getting those today.

And then we can proceed -- so I suspect --

**THE COURT:** And they know they're coming?

**MS. BEIDEL:** They do.

**THE COURT:** Okay.

**MS. BEIDEL:** So I suspect we can get materials from CUNY quickly. I don't know -- I know the government was doing some investigation with respect to ORI. I don't know if they expect that ORI has any additional materials. I'm not in a position to know the timing of that.

**THE COURT:** Well, my understanding from last week was it didn't sound like the government was averse to trying to get

ORI to provide anything that was necessary, but they had this shutdown issue.

**MS. BEIDEL:** Right.

**THE COURT:** So they also said if there was a subpoena, that would make it easier. I don't recall -- I mean, we certainly have approved all the subpoenas. I don't know if any were directed at ORI.

**MS. BEIDEL:** It was not, Your Honor. At the time we issued the subpoenas, we weren't aware of how the shutdown was impacting the government's ability to get that evidence.

**THE COURT:** I understand.

So in terms of a number of days, you don't have a particular proposal just on the *Brady* issue, or do you?

**MS. BEIDEL:** Could I have a moment to confer with my colleague?

**THE COURT:** Sure.

**MS. BEIDEL:** Our proposal, Your Honor, would be one week, although we would suggest, if the Court is amenable to this, that we still impanel the jury today since they're here and then perhaps start with opening statements on next Monday.

**THE COURT:** Okay. Okay. And you're leaving aside the health issues? I mean, just everyone has their own issues. They may overlap; they may not. That's your suggestion?

**MS. BEIDEL:** Correct.

**THE COURT:** Okay. Mr. Tyler, so --

**MR. TYLER:** Your Honor, if I may ask one question in the first instance.

**THE COURT:** Yes.

**MR. TYLER:** With respect to your finding, the *Trump* case is, like, very specific in terms of, like, one agent is part of the prosecution team versus an office --

**THE COURT:** The what case?

**MR. TYLER:** The *Trump* case, which I think we cited in our brief.

Like, at least some of the analysis, there was, like, this one agent worked on the investigation, and so that agent is part of the pros team. And so the question is, in your finding, are you finding that ORI is part of the pros team, or are you finding Mr. Baird is part of the pros team? Because that, obviously, has some different implications for us.

**THE COURT:** Well, for purposes of the motion, I focused on Dr. Baird. So that's the findings about Dr. Baird because he's the one who had possession of this item. I haven't made a broader finding on the whole office.

I would note that I think there was at least one other doctor who was put forward along with Dr. Baird. I think it was Dr. Sharma. It wasn't really relevant for purposes of the motion, but I would -- I guess I'd look at it a couple different ways.

I mean, I think, for purposes of resolving the motion,

that the ruling is focused on Dr. Baird. But as -- as Ms. Beidel has said, to the extent there could be anything that ORI would have on this issue -- if you want me to say -- I mean, if the only way the government is going to produce anything from ORI is they'll just get Dr. Baird's personal files and they're still going to stand on the position that ORI has nothing to do with anything, I might need to expand that.

So part of it is do we need to do that or not?

**MR. TYLER:** So for purposes of clarity, it would be helpful, Your Honor, because if you're finding Dr. Baird is part of the prosecution team, we can go and get his files specifically and try to look at those. And if it's a broader request, that is going to require additional work, obviously.

And I just want to be also very clear about this. With respect to our -- our representations about our discovery practices, we have not done a review of ORI's files; so we have not reviewed their files for *Brady*, *Giglio*, and other materials.

And so, frankly, that probably necessitates us asking for a continuance on that basis as well so that we can go figure out exactly what they have there and how we're going to handle that.

And so that's -- that's -- that's the purpose of the question, Your Honor.

**THE COURT:** Well, here's the question, then:

I mean, with or without a subpoena, if there's anything that Ms. Beidel needs for purposes of this issue regarding the CUNY letter, will the government provide it? Meaning, will ORI provide it if -- if there's anything relevant?

Now, Dr. Baird worked on it. I haven't gone to the level of trying to figure out whether there's someone else other than Dr. Baird who had some responsibility over this CUNY investigation. He clearly did because he got the letter. I don't know if there were others.

Do you know if there were others?

**MR. TYLER:** I do not know. I don't know, Your Honor.

So I guess, Your Honor, the --

**THE COURT:** I mean, I can't -- I can't grant you a continuance for -- I mean, the defense can ask for a continuance under these circumstances; the government can't get a continuance because they now decide they actually have additional things that they should have done that they could have done but they didn't do.

**MR. TYLER:** I understand your position, Your Honor. I just wanted to make clear -- and I think -- I'm imagining Your Honor recognizes this, but we had not done the same search of ORI's files sort of consistent with your ruling.

**THE COURT:** Well, I didn't make any findings as to -- I mean, my -- again, I don't have a complete record. But based on what I have, I don't -- I haven't found a basis to conclude

that ORI was part of the prosecution team prior to this February or April/March time period when they started talking about the *Daubert* testimony.

And so for now -- I mean, that's how I've looked at it.

And then going forward, the issue is really Dr. Baird. But, again, there probably -- I think, if Dr. Sharma was relevant to this, he probably would be as well. But he wasn't really relevant to this particular motion.

I would say, while we're on the topic, that there was at least one -- I had wanted to inquire of you, if I was reading the documents correctly, it appeared as if -- in your brief, you acknowledge that Dr. Brookes's reports were provided to ORI back in 2023, and those reports included some of his comparisons that had images of what we're calling the raw images in them. And then it seems as if those were re-produced to them in early 2025 at the beginning of this time period I'm talking about.

It also, from the e-mails, indicated that the government had brought the actual images themselves to ORI in April of 2025, and I wanted to confirm whether that was true or not because I think that information right there is something that the defense is entitled to regardless of whose possession it was in because the government is trying to make the argument that nobody on the ORI-CUNY side had any -- had these raw images when, in fact, maybe they did. And they certainly were

at least aware of them.

So I just wanted to clarify whether I'm reading that correctly.

**MR. TYLER:** To be clear on this point, Your Honor, obviously, within the reports, there are -- there are the images. We -- we at no point produced the raw images to ORI.

**THE COURT:** But you agree that the reports that were submitted refer to these raw images?

**MR. TYLER:** Yes, a hundred percent.

**THE COURT:** So if someone had actually looked at them, they could have said, well, geez, we don't have those.

**MR. TYLER:** Yes, Your Honor.

**THE COURT:** Assuming you're correct they don't have them, which I just have your word for that on that, but -- and so they could have looked at those and said, well, we don't have these; maybe we should get them.

**MR. TYLER:** That's correct.

**THE COURT:** And that's in 2023 when they got those reports. Same thing could have been said in early 2025.

And then am I correct -- this is ORI. It's not CUNY necessarily. I don't know what ORI is doing with CUNY.

It's also the case, then, in early 2025 that -- in April that the government had a meeting with ORI, counsel and perhaps Dr. Baird or Dr. Sharma, and the images were actually brought to ORI, correct?

**MR. TYLER:** I believe that is correct, Your Honor.

**THE COURT:** Did they give the images? They just sort of show them?

**MR. TYLER:** Just showed -- I believe, just showed, Your Honor.

**THE COURT:** So were they ever fully provided? I think they might have been later in the sequence. I'm not sure.

**MR. TYLER:** No, Your Honor. At no point did we ever, like, produce them to ORI.

**THE COURT:** Okay. Well, anyways, I do think that episode is something that the defense should have access to. These documents were provided in camera.

So I don't know if there's other documents on that issue, but I think certainly the e-mail showing -- I mean, they already know from your briefing and, I think -- well, at least the briefing, if not otherwise, that Dr. Baird -- Dr. Brookes's expert reports were provided to ORI at various times; so, they would have been able to at least look at them. That, I think, is generally known, although maybe the detail of dates wasn't known.

The fact that there was a meeting, which ORI got to see these images, that, I'm not sure is known previously and should be made available to the defense.

Again, I don't know the significance of it because it

doesn't necessarily mean, because ORI got these, that anybody was going to give those to CUNY for any reason. And I'm not sure it really matters other than, I guess -- I can forecast -- it sounds like there's a little bit of a debate that's going to happen as to what extent ORI's -- CUNY's analysis and Dr. Brookes's analysis are the same or different enough that we can view CUNY's analysis as being inconsistent with Dr. Brookes where the government tries to say they're two different things.

But CUNY had -- at least ORI had access to those images. I think that needs to be made very clear.

**MR. TYLER:** Yes, Your Honor.

**MS. BEIDEL:** I had one thing deriving from that, Your Honor.

I'm unaware of what the government's factual basis is for their position as to whether CUNY had these raw images or not. I think that's part of the problem. They didn't investigate that.

So perhaps a remedy could include them being barred from making that representation because, in the time allotted before the trial was scheduled, they did not get to the bottom of whether CUNY had those representations. My best guess is that their position is based on the fact that they took Dr. Wang's personal computers from his home, but that doesn't foreclose the possibility that his CUNY computers contained those same images and that CUNY reviewed them.

**THE COURT:** I agree. I think that's open for argument. But not just argument, really, more of just exploring with witnesses whether the people involved with the CUNY investigation or the ORI investigation -- you're right. I certainly don't have enough in front of me to know that. I know that's the government's position.

But it could be -- and maybe this is what you're seeking through your subpoena -- that there may or may not have been access to those same images through a different computer or some other -- I mean, I think they got things that were in his lab. And so whether they are the same or different is a factual question, I think.

**MS. BEIDEL:** It is, but the government needs a factual basis for the positions that it takes, and I don't think it has one. As of right now, which is when the trial was scheduled to start, they don't have a factual basis, as far as I know, for the position that they are taking with respect to whether CUNY had those images.

**THE COURT:** Well, I think they are saying that their folks had them and never gave them to them and they're drawing an inference from that. And I don't think that's unfair, but it's not airtight either, as you're pointing out. So I think we'll have to see how the evidence comes in and -- you know, whether they get to make that argument at the end, they've got to have some factual basis for it.

**MS. BEIDEL:** Okay.

**THE COURT:** Okay. So --

**MR. TYLER:** Your Honor, if I could make one other -- one other point. This was in the material I provided to you, but I just wanted to highlight it.

We did reach out on Friday to ORI to find the current status of the investigation. And I'm quoting from an e-mail now. It says, "The status is the case remains under ORI's oversight review. This means ORI has not completed its oversight review. During the shutdown, most of ORI is on furlough; so no further progress on ORI's oversight review will take place during the shutdown."

So with that -- with all of this, Your Honor, the government is -- we're going to go and work with ORI to get people unfurloughed to see what we can get and go from there.

**THE COURT:** Right. But I mean, when we say see what we can get, I mean, I think the main thing we want to get is whatever the defense thinks they need for this --

**MR. TYLER:** Yes.

**THE COURT:** -- which I think -- it may overlap with the CUNY request. If there's a subpoena you want to offer for ORI, we'll take care of that today and people should know that it's coming.

But, again, I don't think it should be necessary. I understand the practicalities and maybe having a subpoena will

affect the administrative issues about furloughs. But in terms of -- I think the way I look at it is, whether it's Dr. Baird or anyone else who was working on the CUNY investigation, you know, they're part of this team for purposes of this issue, at least from the April 20 -- February 2025 time period forward.

So, you know, they -- we shouldn't need a subpoena for this, but I understand if you want -- we should issue one, perhaps, to make it easier.

**MR. TYLER:** Absolutely, Your Honor. And that's our understanding now too.

**THE COURT:** Okay. So let's move to the -- so I understand -- so the defense is asking for a week, I think.

Now, Mr. Tyler, just can you give me a more specific report about your colleague's issues?

**MR. TYLER:** Yes. Thank you, Your Honor.

Our colleague started to fall ill Saturday evening. He had an extremely high fever yesterday. He was attempting to continue to work remotely but was really not able to do any of the work.

He was hospitalized around 6:00 p.m. At the time he left for the hospital, he indicated to us he had a fever of 104.5. And then we heard from him again around 9:00 p.m. and spoke to him briefly. At that time he was still at the hospital. I don't want to, obviously, get too much into it.

**THE COURT:** No, I understand. Did he have to stay

overnight or is he --

**MR. TYLER:** At least, I have not personally been in touch with him this morning; so I don't know if he did or not.

**THE COURT:** Okay.

**MR. TYLER:** And he was -- at that time, he just told us that -- he was already been told by doctors he's not allowed to go to court until Thursday at the earliest. He was potentially highly contagious and a risk to other members.

Obviously -- I will also report that, you know, you can imagine, he's been in close contact with other members of the trial team over the last four or five days. So far, at least, we don't have any symptoms here. But I just wanted to report that just given the circumstances.

**THE COURT:** Again, I mean, I understand there's a balance between healthcare privacy and what we need to know for this, but I don't know if he knows or there's been a diagnosis or what the condition -- you don't need to disclose what the condition -- but do you have any information on whether the condition is such that one could expect that people who had been near him in that time period would be vulnerable or not and how long it would take to find out?

I know for various conditions we've learned over the years, like, they have guidance on this kind of thing for at least certain things, and I don't know if you got any information of that kind.

**MR. TYLER:** The -- Your Honor, can I just consult briefly with -- there's, obviously, a little tricky line.

**THE COURT:** Again, you don't need to give me any specifics. It's just more, like, is there a sense that, based on the amount of time you all spent together, that there could be a problem, and if so, when would it manifest or something like that.

**MR. TYLER:** The answer to the first thing I think is yes. The second question, I don't know the answer to one -- how long it would take to manifest.

If you allow me one moment to just consult to see if anybody else has better information.

**THE COURT:** Sure.

**MR. TYLER:** Your Honor, I -- if you're okay with it, I think -- and happy to do this with defense counsel, we could approach and give a little bit more detail, just a matter of --

**THE COURT:** Can we just do it on the headsets?

**MR. TYLER:** Yeah.

**THE COURT:** Let's do this. We can have this part be under seal, at least provisionally.

****The following proceedings are SEALED by order of the Court****

*****THIS ENDS THE SEALED PORTION OF THE TRANSCRIPT*****

**THE COURT:** Okay. So we're back in the open session.

I did want to ask -- so let me ask this.

On the one hand, you know, obviously, health issues arise in trials for all sorts of folks -- parties, witnesses, judges, counsel. We always try to accommodate as much as possible.

At the same time, when you have a very long trial, you know, three, four weeks, it's -- there's a lot of issues in terms of finding times for everyone's schedule to make it work. And I'm conscious of that.

I'm also conscious of the fact that we've invited about 65 members of the community be jurors today, and they -- in addition to them being here today downstairs, there's also the question of them having been told how long the trial would be. So if we extend out the timeline, we may have people who, you know, didn't understand that it was going to take longer because we didn't know it was going to take longer. So there's a number of variables here.

So the first thing I want to ask, just as a practical matter -- well, Ms. Beidel had raised one issue, which is if the continuance is limited, can we -- or is there any objection to us picking the jury today? Because we have brought these

folks in, if we let them go saying we weren't going to do anything, they don't -- they don't come back next Monday. They are pretty much done, and we have to get a whole new group for the following Monday.

So we're already in a mode where being able to pay the jurors is something that can happen, but as you know with the shutdown issues, it's not a great situation to have to do it twice.

Is that something we can do, do you believe?

**MR. TYLER:** We have no objection to choosing the jurors. I think that's a separate question whether we could actually impanel them today. But we certainly have no objection to --

**THE COURT:** And my thought was, if we're not just talking about one or two days, my suggestion, although it's a little bit tricky, is that we would pick the jury, we would instruct them and say, look, you can't talk about this case or do any research -- all the things we always tell people -- between now and when we start. But we would not necessarily swear them in. I think it just gives us more flexibility on the whole situation. Once you swear them in, a lot of things kick in.

And since -- not -- leaving aside whether there's health issues that would make it harder to do the trial, just with jurors, they are -- you know, the more days you're on, the more

chances there are we're going to lose some of them; so I wouldn't want to lock ourselves in that way.

So we can do that if the parties don't object to it; and then the first day before we do anything else, we could swear them in, do the rest of the preliminary instructions, and go from there as if that's how we always do it.

**MR. TYLER:** Yeah. We certainly have no objection to that. That makes perfect sense to the government.

**THE COURT:** How does that sound to you, Ms. Beidel, at least as far as jury selection?

**MS. BEIDEL:** We don't have an objection to that, Your Honor.

**THE COURT:** As far as timing goes -- well, first off, I think you had already -- we already figured out Mr. Pathan was going to do the opening.

As a practical matter -- and, again, I'm not saying that we would want to do a lot of things without Mr. Sridharan, but are there things in the first three days that he was definitely going to do that no one else is really in a position to do? And we can also talk about whether those things can be moved around. But just the first part of the trial, how important is his presence, just as a practical matter?

**MR. TYLER:** Your Honor, his -- it's pretty important because he is slated to take the second witness, which is Special Agent Weeks, which is a very -- a pretty big part of

the case. And so that's -- that is -- that is the situation.

Obviously, with a week we will have more information and maybe more ability to try to adjust. But, like, if it were to go forward tomorrow, that would create, like, very significant problems for how we'd be able to do that.

**THE COURT:** Who's the first witness?

**MR. TYLER:** The first witness is Dr. Laurie Ryan from NIH.

**THE COURT:** Is that a long witness or not?

**MR. TYLER:** I expect her to be an hour or two; so not particularly long.

**THE COURT:** Okay. So you were planning, probably, to have this second witness start on Tuesday.

**MR. TYLER:** That's correct, Your Honor.

**THE COURT:** If not -- well, probably not today, but -- okay.

And then I guess the natural question is is there any specific reason why Special Agent Weeks has to be the second witness? As you know, these are not, like, a play. I always say this is more like a sporting event than a play. Like, you can have a plan, but it doesn't always work out that way and you have to adjust.

**MR. TYLER:** I would say for almost every other witness in our -- in our lineup, that is more true for -- most of the evidence is coming in through Special Agent Weeks; so

that creates a lot of complications if he's not very early in the trial in terms of having -- presenting and having that stuff introduced so that other witnesses can use it.

Obviously, there are different ways, potentially, to work around that, with conditional admission and that type of thing, if we can get agreement. But that's -- that is -- there's, like, a real central, like, issue in terms of just making sure that we have the evidence in so we can use it during the trial.

**THE COURT:** Okay. So does his testimony include these raw images and getting those in evidence?

**MR. TYLER:** Yes, Your Honor.

**THE COURT:** Okay. Ms. Beidel, I'm just -- again, I'm not saying I'm asking you to do this, but just as a practical matter, if for some reason we said, well, let's see, because of practicalities, we need to start with someone like Dr. Brookes, would you have objection to a conditional admission and wait or would you want to see Special Agent Weeks before anybody gets to consider any of this stuff?

**MS. BEIDEL:** We do not have an objection. In fact, Your Honor, we offered the possibility of stipulating to the fact that these images derive from certain locations other than Dr. Wang's devices if that would facilitate the schedule.

**THE COURT:** So the practicalities of this are twofold. One is on the one hand, the defense has asked for a week for these other issues. And as I said, I think they

generally should get what they need on this under the circumstances. It does happen to overlap with the government's request.

But just to play this out, we're dealing with probably we're losing about three days, maybe a little bit more because my expectation has always been that we would get, you know, the openings and maybe even part of the first witness done today. But about three days.

Now, we can always tell the jury a little bit longer, as we maybe should; but at the same time, their notice that was sort of in front of them that made them decide whether they could come for jury selection today or whether they might need to ask for another date was four weeks, which I think the 17th is like four weeks and a day or exactly four weeks.

So I was looking at the schedule, and we aren't sitting on Fridays. There are a few Fridays where it just really doesn't work. One is the 7th. I think the 14th would cause some serious inconvenience to other matters, but if we're desperate, we can do something -- the 31st is the one day where we can add some time to try to make up the ground a little bit.

Now, I would usually prefer -- I've learned the hard way that if -- you know, afternoon on the 31st is tricky for a lot of jurors if they have kids. But -- so I would probably suggest either a half day or maybe ending at 3:00 or something like that at the latest so it wouldn't be a full day. But we

could try to add that back in.

There's a possibility we could do the morning of this Friday, but that's still within the window of everyone is asking for a continuance.

So I'm really not a great position to add more time other than that 31st.

Now, we did have -- I think we were counting 13 trial days, including jury selection, which only took us to November 10th, maybe the 12th, because we have a half or three-quarter day on November 6th.

So we do have a little bit of a cushion with the 12th and the 13th where the testimony with the 31st might still be done, you know, before the end of that week, but then the week of the 17th would then kick in as sort of main deliberations week.

So my question is, based on what we know now, does anyone have a greater sense of whether that 13 days is accurate, a little longer than we probably actually need or a little shorter, given everything including this *Brady* issue, but also stipulations and things that the parties have been discussing over the last few days?

**MR. TYLER:** From the government's perspective, I wouldn't say a lot, but I think things are going to be at least a little shorter. For example, Dr. Brookes's testimony is going to be shorter than it could otherwise be. And so -- and that is actually resulting in us sort of trying to rejigger and

streamline things a little bit as well more broadly.

So I think, if anything, ours is being cut back -- at least our presentation may be cut back -- I don't know -- like a quarter or a half a day just based on how things are going.

So that's -- I think that may be where we are, Your Honor.

**THE COURT:** From your side?

**MS. BEIDEL:** Your Honor, we also believe we can streamline, given some additional time, now that we're better aware of the nature of the government's case. We also don't have any intention to add any witnesses to the witness lists that were exchanged today. I'm hopeful that the government has the same intention.

And so I think we can work -- whittle down from where we are and hopefully streamline things.

**THE COURT:** Do you think that this issue with the *Brady* issue -- I know you don't know what you don't know -- but are you thinking you might actually try to add witnesses or just have information to use with existing witnesses?

**MS. BEIDEL:** We have already listed the two people from CUNY that we anticipate would be those witnesses.

**THE COURT:** I see.

**MS. BEIDEL:** At worst, if we learn we have the incorrect witness from CUNY, we might substitute someone in for -- we've actually listed two. I'm hopeful it would only be one. I think we have the correct person, but, you know, we may

need to substitute someone.

**THE COURT:** Okay. Well, let's do one more look at the calendar here.

**MS. BEIDEL:** Your Honor?

**THE COURT:** Yep.

**MS. BEIDEL:** We do have this Friday available if that does work for the Court and the government's schedule. I think what I heard was that the -- the doctor thinks perhaps a Thursday start would be acceptable. I know we asked for a week, but we weren't really contemplating the Friday. If we got the four trial days this week, I think that would be sufficient.

**THE COURT:** Would Thursday be too early for you? Again, this would have to be a game time decision obviously.

**MS. BEIDEL:** I think we can start Thursday. It will just give us a little bit --

**THE COURT:** I think Friday we could do some, but we really would only be able to do the morning. I don't think we could do the afternoon. So -- I'm not even sure how much of the morning we could do. I mean, we could do Thursday, but, again, somewhat dependent on other issues.

Mr. Tyler?

**MR. TYLER:** Yeah. From the government's perspective, I think that would be pretty risky to set right now, just given Mr. -- the health situation. So I think we're -- we -- our

position would be that the week would be the best way to do it and especially given that we've got things cut back. And also that will help, I think, with the presentation in the sense that there's no weekend in between and we can just kind of roll -- roll into the week.

**THE COURT:** No, I understand. Because I mean, I think what I would probably end up doing, if we were doing it Thursday, is we would be, like, telling the jurors that we'll call them on Wednesday night to tell them whether we can have them. Although, it does sound like if we need to do a day without Mr. Sridharan, we could probably figure out how to do that. It's just not ideal.

Is that fair?

**MR. TYLER:** I think we could do -- I mean, we could do a witness. I don't know that we could do a day just given -- given where we are.

So I think -- like, our position, in terms of the health issues, is that we'd like -- we'd like to start Monday.

**THE COURT:** Okay. Let me look at the calendar one more time just while we're here.

So what this does is we count today sort of as a day because the jury selection is not a full day. It means that we got one day today, four days next week, that's -- five days next week, but it's a partial on Friday, the 31st. That's six days.

The week of the 3rd, we have three and a half days or maybe three and three-quarters; so that's -- let me see. Five, six -- ten days.

Then we have three days the week of the 10th. That's 13 days, but two of those are not full days. And today is not a full day, probably.

And then the 17th, we still have the 18th and the 19th we could do, but we'd have to move a few things around. The 20th, I don't think -- I can't be here on the 20th. The 21st, we could do at least part of the time. And the deliberations, obviously, is a little bit different.

Are the 18th and the 19th days that you could be here if you needed to be?

**MS. BEIDEL:** Yes, Your Honor.

**MR. TYLER:** Yes, Your Honor. And one other point my colleague pointed out, which is an advantage on the health issue, is just by the time we get to next Monday, we all know that the rest of us can be in the clear so we're not exposing anybody else, which, obviously, we don't want to do.

**THE COURT:** So I don't want to get into a strange situation, but just to forecast for you, if we finished the week before and the 17th was just deliberations, we usually are done. But if for some reason we finished on the 18th or 19th, I would end up telling the jury that, for better or worse, they just need to take a day off and come back on the 21st to

deliberate.

Anybody have any problems with that?

**MR. TYLER:** Not from the government, Your Honor.

**MS. BEIDEL:** No, Your Honor. Thank you.

**THE COURT:** Hold on one second.

So, again, with the representation that we're going to move as quickly as we can, I think we can -- I'm not sure what I would have done, frankly, if it was just the government's issues, but the defense also has issues regarding continuance which were serious.

What we'll do is we'll pick the jury today, and I understand they're ready. We will tell them that -- we won't swear them in, but we'll tell them we need them on Monday morning, and we'll swear them in at that point, do the final -- or do the preliminary instructions and openings at that point. Obviously, you'll give us reports on the issue regarding the health issues.

So on the one hand, I'm granting the government's motion for continuance until Monday, but I'm also going back to the *Brady* issue, taking the view that, separate and apart from that, where the defense has asked for a week's continuance in light of the *Brady* issue, I'm granting that request as a means to address the *Brady* issues. So that's also part of this.

We will -- I think what I might do, just -- we'll extend out the dates that we're saying that we need jurors to -- I

think I'm going to say the 19th, which is actually more than four weeks. I think what I'm going to suggest is we seat an additional alternate, which doesn't change the number of strikes; it's just -- there's one more slot for an alternate.

You get two strikes for every one seat. And so when we had three alternates, you get two strikes each; when you get four alternates, you still only get two strikes. But it gives us some flexibility. Frankly, between today and next Monday, somebody is going to come up with some reason why they can't do this, and I normally wouldn't let them go if we don't have enough alternates. It gives us more flexibility. So why don't we do that.

Any questions about that approach?

**MR. TYLER:** No, Your Honor.

**MS. BEIDEL:** No, Your Honor.

**THE COURT:** And, again, Ms. Solomon will give you an update on exactly what our scheduling issues are. We'll do Friday the 31st, probably try to take it until 3:00 or midafternoon. The rest of it stays in place. Other Fridays are not available at this point. And the 18th and the 19th are available. The 20th is not. And we'll go from there.

But would keep the other Fridays open. If things break in a certain way and we can open up a Friday, and we'll let you know whether there's -- it's really the 14th is the only day. The 7th is not going to work.

Hopefully with the streamlining we've said and the more there are stipulations on certain things, on evidence, the faster it can go. I found, because we really try to fill the day and not every trial situation is like that, we -- our trials tend to move faster than some other sessions. So hopefully that will happen.

Okay. So we'll take a quick break. The jury will be brought in. And, you know, the members of the public will have to clear out unless there's, like, a last row available or something like that. But, like, unfortunately, we've got to make room for the jurors. And once they are all in place, we'll come back, we'll do the procedures we talked about, and we'll get going with that.

Let me ask -- okay. We'll take a short break. I think what we were saying was I think this might work, depending on the number of jurors. If there are members of the public who want to stay, we might be able to use just this first row behind the defense for that. We were planning to start the jurors a little further back.

Oh, sorry. Behind the government's side. Yes, behind the government's side, which is your side over there, because as can you see, there's extra rows on that side.

Are the folks -- Mr. -- are the folks kind of in the front here, are they members of either side's trial team, or are they just members of the public?

**MS. BEIDEL:** On our side, Your Honor, there's members of Dr. Wang's family. I was going to ask whether they could just sit up here briefly during the jury selection process so they can stay, but --

**THE COURT:** Well, I think we can keep them in the gallery and still have room for people if we just put them on this side here that sticks out in front of it.

How about your side, Mr. Tyler?

**MR. TYLER:** We have two supervisors from my section and also another paralegal who is -- works on the case with Ms. Cornish.

**THE COURT:** Okay. If we can keep -- Ms. Solomon will direct you all. We need to keep the nonjurors in a very specific area closer to the front, and then everyone needs to understand who they are versus the jurors. But I think we can accommodate within the gallery.

Okay. So we'll -- soon as the jurors are here, we'll get going. Again, you might want to take a quick break now since we generally are not in a position to take very many breaks during the selection process.

Thank you very much.

**DEPUTY CLERK:** All rise. This Honorable Court now stands in recess.

(Recess taken at 9:34 a.m.)

*** End Excerpt ***

CERTIFICATE OF OFFICIAL REPORTER

I, Paula J. Leeper, Federal Official Court Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 20th day of October 2025.

*/S/ Paula J. Leeper*

____________________

Paula J. Leeper, RPR, CRR
Federal Official Reporter